Rommy **REVSON**, Plaintiff–
Counterclaim–Defendant–
Appellant,

v.

**CINQUE & CINQUE, P.C.**, Defendant–
Counterclaimant–Appellee.

Docket No. 99–7747

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 2000

Decided Aug. 4, 2000

States District Court for the Southern District of New York, Denny Chin, *Judge,* entered after a jury trial, (1) dismissing her claims for a declaratory judgment and monetary relief against her former attorneys, defendant Cinque & Cinque, P.C. ("Cinque & Cinque" or the "firm"), and (2) ordering Revson to pay the firm $732,370, including prejudgment interest, on its counterclaim for the reasonable value of legal services rendered to her. On appeal, Revson contends principally that the district court erred (a) in interpreting her retainer agreement with Cinque & Cinque as requiring her, as a matter of law, to pay fees in excess of the firm's hourly-rate charges; (b) in refusing to instruct the jury that the firm had the burden of proving that Revson fully understood that agreement to have the meaning the firm ascribed to it; and (c) in ruling that a letter written by Revson, which was held inadmissible to show a contingent fee agreement, was admissible as evidence of the value of the firm's services for quantum meruit recovery. For the reasons that follow, we conclude that the judgment should be affirmed to the extent that it dismissed Revson's claim that she terminated the firm for cause, and that in other respects, the judgment should be vacated and the matter remanded for a new trial.

Judd Burstein, New York, New York (Benjamin J. Stone, Burstein & McPherson, New York, New York, on the brief), for Plaintiff–Counterclaim-Defendant-Appellant.

James P. Cinque, New York, New York (Robert W. Cinque, Cinque & Cinque, New York, New York, on the brief), for Defendant-Counterclaimant-Appellee.

Before: KEARSE, CALABRESI, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Rommy Revson appeals from an amended judgment of the United

## I. BACKGROUND

Revson is the inventor of the "scunci," sometimes called a "scrunchy," a cloth-covered, elasticized hairband sometimes worn around ponytails. Millions of dollars worth of scuncis are sold each year. As the patent holder, Revson was often engaged in negotiations or litigation with respect to patent and licensing rights. Cinque & Cinque was a New York City law firm whose partners were Robert W. Cinque ("Robert Cinque" or "Cinque") and James P. Cinque ("James Cinque" or "James"). The present action arises out of the firm's representation of Revson in connection with her scunci business, including two controversies with L & N Sales &

Marketing, Inc. ("L & N"), and two with Riviera Trading, Inc. ("Riviera").

Some of the events are not in dispute. The following account is taken largely from the trial evidence and from an opinion of the district court dealing with the imposition of sanctions on Revson's present attorney in connection with his conduct in this litigation, *see Revson v. Cinque & Cinque, P.C.*, 70 F.Supp.2d 415 (S.D.N.Y. 1999) (*"Revson I "*). The sanctions issues are the subject of a separate appeal, dealt with in a separate opinion also filed today, *see Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir.2000).

## A. *Cinque & Cinque's Representation of Revson*

In March 1993, Revson retained Cinque & Cinque to represent her in connection with an ongoing arbitration against L & N ("first L & N matter"), replacing attorneys with whom she had become dissatisfied. The retainer agreement, in the form of a March 24, 1993 letter from Robert Cinque to Revson, signed by Revson on March 25, 1993 ("1993 Retainer Agreement" or "Agreement"), read as follows:

> This letter will confirm that you have retained the firm of Cinque & Cinque, P.C. to represent you both as litigation counsel in your current dispute with the new L & N Sales & Marketing, Inc. and generally in connection with your activities as creative artist, inventor and patent holder.
>
> My customary hourly billing rate is $325.00 and that of my brother James is $300.00. The time of our associates is billed at lesser rates depending upon the level of experience of the particular individual involved. These rates range between $150.00 and $250.00. Paralegal time is billed at the rate of $50.00 per hour.
>
> While we keep daily records of the time we spent [*sic* ], in fairness to you in this matter involving the many issues which arise from the current dispute

with L & N our billing will take into account not only the amount of time spent, but also the result achieved.

> Of necessity, a fair amount of duplication of attorney effort and time must take place, and I do not believe it appropriate to charge you the full rate for this. At the same time, if we are able to achieve an outstanding result or substantial benefit for you, then our billing would be adjusted accordingly following consultation with you. We generally render statements on a monthly or other periodic basis reflecting services rendered, disbursements incurred and the amount charged.
>
> You have agreed to pay us a retainer on account in the sum of $25,000.00, the receipt of which we acknowledge. You are of course free to terminate our representation of you at any time and for any reason. If you do so, you will receive a refund of any unused portion of the retainer.
>
> If the foregoing accurately sets forth our understanding, kindly sign and return one copy of this letter to me.

(1993 Retainer Agreement at 1–2.)

For nearly five years thereafter, Cinque & Cinque represented Revson in the first L & N matter and a number of other matters. During that period, Revson paid the firm fees totaling approximately $400,000. The firm's hourly rates did not change. Cinque testified, however, that during 1996 and 1997, the firm billed some $50,000 less than its normal hourly rates for the time spent, and that on at least one occasion, after negotiating a $300,000 licensing fee for Revson, Cinque billed her on a percentage basis—five percent of the $300,000 fee.

The client-attorney relationship between Revson and Robert Cinque developed into a social relationship as well. At trial, Revson stated

> [h]e was like a brother that I didn't really have. He was a friend. He and Jane [Klein, Cinque's companion,] were

both friends. We had a lot of fun times together.

(Trial Transcript ("Tr."), at 62–63.) Cinque and Klein once visited Revson at a house Revson had rented in Sun Valley. In February 1997, Cinque and Klein visited Revson at her home in Florida for several days. Cinque spent some portion of that time—the parties dispute how much—working with Revson to prepare for the second L & N arbitration ("second L & N matter"). After Cinque and Klein left, Revson wrote Cinque a note that read, in part, as follows:

Dear Bob & Jane,

Sadness, tears, love, emptiness, and yet, happiness, belonging and a strong sense of friendship and family fill my heart as your little white car is pulling away from my happy little orange cottage (that *you* got for *me* from Riviera).

*Time flies* when we are together. My happiest moments are probably dinner, cocktails, and morning greetings when you *both* are near. . . .

You probably know, that of course, it's a scary . . . time for me, with everything I've worked so hard to create is [*sic* ] on the line. Through encouragement, calmness, order & sensibility from both of you, I *trust* in your judgment and support.

In my life, very few people have believed in me and supported me and took the time out to understand me, Both of you did! For this, I *love both* of you. . . .

One night at dinner, I had mentioned that I would give you 10% (ten percent) of *whatever* you recover for me from L & N. I *want* to unequivocally state that is exactly what "the deal" is. You stood by me and deserve it! This would make me happy.

I will *not* disappoint you with my courage and hard work, as I *know* you won't let me down like all the others did. I do look forward to standing shoulder to shoulder against L & N, you'll see.

(Letter from Revson to Cinque and Klein dated February 12, 1997 ("February 1997 Letter" or "Letter"), at 1–5 (emphases in original).)

### B. *The Termination of the Relationship*

In addition to the Riviera transaction referred to by Revson in her February 1997 Letter, Cinque negotiated a second Riviera agreement in the fall of 1997 ("Riviera II"). The agreement, executed on December 4, 1997, called for Riviera to pay Revson a total of $2.4 million, of which $1.5 million was paid to her at the closing, with the remaining $900,000 to be paid over three years. At the closing, Revson gave gifts to Cinque and to Riviera's attorney. On the following morning, Cinque telephoned Revson, in part to discuss whether she would be attending the deposition that day of a witness in the second L & N matter. In that conversation, Cinque raised the subject of the firm's fee for negotiating Riviera II. He referred to the 10 percent "deal" that Revson had promised in her February 1997 Letter with respect to L & N, and he suggested that the firm deserved a fee of a "little more" than 10 percent of the amounts to be paid under the second Riviera agreement. *Revson I,* 70 F.Supp.2d at 420. Revson became upset and said she wanted to think about it.

Revson and Cinque did not discuss the matter again for some five or six days. On Thursday December 11, Cinque learned that Revson had consulted another attorney, Ronald Witkowski, about the second Riviera agreement and had negotiated a modification agreement. "Cinque was upset by this turn of events, both because he felt the proposed modifications were unfavorable to Revson and because he believed Revson had gone behind his back." *Id.* That afternoon, Revson and Cinque spoke by telephone, and Cinque told Revson he believed the modifications gave away certain rights for no consideration.

They also discussed the issue of the Firm's fees for the second Riviera

agreement, and the conversation became heated. Revson finally said to Cinque, "that's it, you are fired," and hung up the telephone. (Trial Tr. at 509–10). Within a minute, a fax arrived at Cinque's office; it was a letter from Revson terminating the relationship. The letter stated in part as follows:

> I write to inform you that I have decided to discharge you and your firm as my counsel for all purposes (including the L & N arbitration), and replace you with Judd Burstein and the firm of Burstein & Fass LLP....
>
> Upon presentation of the detailed billing statement that I have been requesting for months, I will of course promptly pay all time charges and disbursements due and owing to your firm.

*Revson I,* 70 F.Supp.2d at 420 (emphasis omitted).

## C. *The Present Action*

After an exchange of letters between Revson's new attorney Judd Burstein and Cinque on Monday December 15, Revson commenced the present action on December 16, 1997. The original complaint alleged, *inter alia,* that Cinque & Cinque had refused to provide contemporaneous time records to Revson and that Cinque had made professionally irresponsible threats to her, including threatening to withdraw as her attorney unless she paid the firm a bonus. The complaint sought an injunction requiring Cinque & Cinque to turn over Revson's files that were needed for the ongoing second L & N arbitration, and requested a declaratory judgment principally stating that (a) Revson was not obligated to pay Cinque & Cinque any additional fees because the firm had been discharged for cause, and (b) the firm was not entitled to a bonus with respect to Riviera II.

The dispute over Cinque & Cinque's retention of Revson's files was soon resolved after Revson moved for a preliminary injunction for their release. Revson agreed to deposit certain funds in escrow, and the firm agreed to release the files to her new attorneys.

On January 5, 1998, Revson filed an amended complaint. While dropping some allegations and the request for an injunction, the amended complaint added a claim of fraud and breach of fiduciary duty, alleging that since 1994 Cinque & Cinque had sent Revson bills based on fraudulent time charges. Cinque & Cinque counterclaimed for the fair and reasonable value of its services. It contended that the Retainer Agreement required Revson to pay fees based on the firm's hourly rates plus bonuses for results achieved. In addition, relying on Revson's February 1997 Letter, Cinque & Cinque contended that the parties had

> an understanding that based upon the "result achieved" in addition to time spent, Revson would pay [it] 10% of whatever she recovered as a result of the Cinque firm's efforts in the Riviera and L & N matters.

(Cinque & Cinque Memorandum in Opposition to Revson's Motion for Partial Summary Judgment at 5.)

Prior to trial, the district court granted partial summary judgment in favor of Revson, dismissing Cinque & Cinque's counterclaim to the extent that the firm contended that it was entitled, as a contractual matter, to be paid its time charges plus 10 percent of any recovery. The court stated, in pertinent part, as follows:

> The retainer agreement contemplated an adjustment to time charges based on "the result achieved," but it did not specify the amount of any adjustment and instead called for the adjustment to be made "following consultation with [Revson]." Even assuming a writing from the client, rather than the lawyer, satisfies the writing requirement [of the Code of Professional Responsibility], Revson's February 12, 1997 note referenced only the L & N matter and made

no mention of the Riviera matter. Therefore, a reasonable jury could only find that the Firm had never reduced to writing Revson's purported agreement to pay a 10% contingency with respect to Riviera. Hence, the purported agreement to pay an additional 10% for the Firm's services with respect to the Riviera matter is unenforceable as a matter of law.

Memorandum Decision dated May 3, 1999, at 2–3.

The district court also ruled, however, that Cinque & Cinque would be allowed "to argue that a reasonable fee may exceed something more than just time charges," *id.* at 4, and to introduce, as evidence of a reasonable fee, the February 1997 Letter with its reference to a payment of 10 percent, *see, e.g., id.* at 3–4 ("The Firm will be permitted to refer to the purported percentage fee agreement in arguing for an upward adjustment with respect to Riviera and for the reasonable value of its services with respect to L & N.").

At the jury trial, the district court, consistent with the latter rulings, interpreted the 1993 Retainer Agreement between Revson and Cinque & Cinque, as a matter of law, as a "value-added retainer agreement" (Tr. 608) that required Revson to pay the firm its time charges plus adjustments based on the results achieved. Although the court acknowledged to the parties that the Agreement was "not the clearest letter in the world" (*id.*), the court found that the Agreement was, in that respect, unambiguous as a matter of law. Accordingly, the court instructed the jury in part as follows:

> Cinque & Cinque's entitlement to fees is governed by the retainer agreement entered into between Ms. Revson and the firm in March of 1993. *The agreement provided for Cinque & Cinque to be paid for its time on an hourly basis subject to an adjustment* following consultation with Ms. Revson *based in part on the result achieved.* ... Because Ms. Revson and Cinque & Cinque did not reach

agreement on any adjustment, the law provides that Cinque & Cinque is to be paid the reasonable value of its services. It is up to you to decide the reasonable value of Cinque & Cinque's services in connection with the Riviera II matter.

(Tr. 833–34 (emphases added).) The court instructed that, in order to determine the reasonable value of those services, the jury was first to calculate the time charges and then to determine an appropriate upward or downward adjustment.

The jury was given a special verdict form, and it answered all questions of substance in favor of Cinque & Cinque. It found that the firm had not breached its fiduciary duties to Revson and that Revson had not discharged the firm for cause. With respect to the second L & N matter, the jury found that Cinque & Cinque was entitled to $90,000 in time charges, plus an upward adjustment of $325,000 to arrive at the reasonable value of its services, for a total fee of $415,000. With respect to Riviera II, the jury found that Cinque & Cinque was entitled to $25,000 in time charges, plus an upward adjustment of $180,000 to reach the reasonable value of its services, for a total fee of $205,000. As to other matters, the jury found that the firm was entitled to $50,000 for its time, without any adjustment. Thus, the jury awarded Cinque & Cinque a total of $670,000 in fees from Revson as the reasonable value of its services.

Judgment was entered reflecting the jury verdict. An amended judgment was entered adding prejudgment interest, bringing the total award to $732,370. This appeal followed.

## II. DISCUSSION

On this appeal, Revson contends principally that the district court erred (a) in ruling that the 1993 Retainer Agreement as a matter of law required her to pay Cinque & Cinque time charges plus an adjustment for results obtained, (b) in refusing to instruct the jury that Cinque &

Cinque bore the burden of proving that Revson fully understood the Retainer Agreement to have that meaning, and (c) in allowing Cinque & Cinque to introduce the February 1997 Letter as evidence of the value of its services. She also contends that she should have been allowed to argue that the firm's effort to enforce an oral agreement as a contract violated the Code of Professional Responsibility and provided cause for the firm's dismissal. For the following reasons, we find merit in the first three contentions.

## A. *Interpretation of the 1993 Retainer Agreement*

■ The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous. Under New York law, the meaning of a contract that is unambiguous is a question of law for the court to decide. *See, e.g., K. Bell & Associates v. Lloyd's Underwriters,* 97 F.3d 632, 637 (2d Cir.1996). Although the meaning of even an ambiguous contract is also to be decided by the court if there is no extrinsic evidence as to the agreement's meaning, *see, e.g., Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 148 (2d Cir.1993); *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462–63, 435 N.E.2d 1075 (1982), the meaning of an ambiguous contract where there is such evidence is a question of fact for the factfinder, *see, e.g., Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 573 (2d Cir.1993); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir.1985).

■ Contract language is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)).

Ambiguous language is language that is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Associates v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (internal quotation marks omitted). We review *de novo* a district court's determination of whether a contract is ambiguous. *See, e.g., Tourangeau v. Uniroyal, Inc.,* 101 F.3d 300, 306 (2d Cir.1996).

■ In the present case, the district court ruled as a matter of law that with respect to both the second L & N matter and Riviera II, the 1993 Retainer Agreement, although "not the clearest," unambiguously "provided for Cinque & Cinque to be paid for its time on an hourly basis subject to an adjustment following consultation with Ms. Revson based in part on the result achieved" (Tr. 834). Reviewing this question *de novo,* we conclude that the 1993 Retainer Agreement is, with respect to those matters, ambiguous at best.

The Agreement, which is quoted in full in Part I.A. above, began by describing the scope of Cinque & Cinque's representation of Revson, with the first paragraph stating that the firm would represent her "both as litigation counsel in [her] *current* dispute with the new L & N . . . and generally." (1993 Retainer Agreement at 1 (emphasis added).) The second paragraph set out the firm's hourly rates. These paragraphs made no distinction between the then-current L & N matter and other matters. If the paragraph that stated the possibility of a fee adjustment from the hourly rates based on result (which we will call the "bonus provision") had followed immediately after either the first or the second paragraph of the Agreement, we might agree with the district court that the bonus provision unambiguously applied to all matters. The bonus provision, however, appeared in the fourth paragraph of the

Agreement, and the intervening paragraph referred only to the then-current L & N matter:

[3] While we keep daily records of the time we spent [*sic*], in fairness to you *in this matter involving the many issues which arise from the **current dispute with L & N** our billing will take into account not only the amount of time spent, but also the result achieved.*

[4] Of necessity, a fair amount of duplication of attorney effort and time must take place, and I do not believe it appropriate to charge you the full rate for this. At the same time, if we are able to achieve an outstanding result or substantial benefit for you, then our billing would be adjusted accordingly following consultation with you. We generally render statements on a monthly or other periodic basis reflecting services rendered, disbursements incurred and the amount charged.

(1993 Retainer Agreement at 1 (emphasis added).) Thus, the bonus provision in the fourth paragraph did not state that it applied to Revson's matters generally. Nor did it directly follow a paragraph that applied to Revson's matters generally; rather, it followed a paragraph that applied only to the then-ongoing dispute with L & N. It is surely a reasonable interpretation to read the fourth paragraph's bonus provision as referring only to the matter described in the paragraph immediately preceding it, rather than as alluding, leapfrog fashion, to the "general[ ]" matters referred to three paragraphs earlier. We conclude that the district court erred in viewing the agreement as unambiguous with respect to the matter of a bonus for Cinque & Cinque for the second L & N matter and Riviera II, and erred in instructing the jury that, after determining the appropriate time charges for those matters, it "must" (Tr. 832) proceed to consider whether additional fees would be reasonable.

Accordingly, we conclude that the question of the fees to which Cinque & Cinque was entitled from Revson for the second L & N matter and Riviera II—a question that is integral both to the firm's counterclaim for fees that include bonuses and to Revson's request for a declaratory judgment that she is not required to pay more than the contractually specified hourly rates—should be retried to a properly instructed jury.

**B.** *Proper Instructions as to an Attorney's Duty To Explain the Retainer Arrangement to His Client*

Under New York law, equivocal contract provisions are generally to be construed against the drafter. *See, e.g., Albany Savings Bank, FSB v. Halpin,* 117 F.3d 669, 674 (2d Cir.1997); *Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d 172, 176, 507 N.Y.S.2d 610, 612, 499 N.E.2d 864 (1986); *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283 (1985). Fee arrangements between an attorney and client are scrutinized with particular care, and an attorney who has drafted a retainer agreement ordinarily has the burden of showing that the contract was fair, reasonable, and fully known and understood by the client. *See, e.g., Mar Oil, S.A. v. Morrissey,* 982 F.2d 830, 838 (2d Cir.1993); *Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d at 176, 507 N.Y.S.2d at 612, 499 N.E.2d 864; *Jacobson v. Sassower,* 66 N.Y.2d at 993, 499 N.Y.S.2d at 382, 489 N.E.2d 1283.

In *Jacobson,* for example, the attorney and client had entered into a retainer agreement shortly after an initial consultation. The agreement provided generally that the attorney's time would be billed at an hourly rate of $100, and it stated that the client was to pay a retainer of $2,500, which was termed "non-refundable." The agreement, however,

did not state clearly that the "non-refundable retainer of $2,500" was intended to be a minimum fee and that the entire sum would be forfeited notwithstanding *any* event that terminated the attorney-client relationship prior to 25

hours of service. In the absence of such clear language, defendant was required to establish that plaintiff understood that those were the terms of the agreement and she failed to do so.

66 N.Y.2d at 993, 499 N.Y.S.2d at 382, 489 N.E.2d 1283 (emphasis in original). Accordingly, the trial court refused to enforce the nonrefundability provision and instead "credited defendant with a maximum of 10 hours work and, relying on the $100 hourly rate stated in the retainer agreement, concluded that the fair value of defendant's services was $1,000," *id.* at 992, 499 N.Y.S.2d at 382, 489 N.E.2d 1283. The Court of Appeals, affirmed, stating as follows:

> In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language (*67 Wall St. Co. v. Franklin Natl. Bank*, 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 333 N.E.2d 184). Additionally, and as a matter of public policy, courts pay particular attention to fee arrangements between attorneys and their clients (*Smitas v. Rickett*, 102 A.D.2d 928, 929, 477 N.Y.S.2d 752). *An attorney has the burden of showing that a fee contract is fair, reasonable, and fully known and understood by the client* (*id.; Cohen v. Ryan*, 34 A.D.2d 789, 790, 311 N.Y.S.2d 644). As the Appellate Division stated in *Smitas v. Rickett* (*supra* ), "[e]ven in the absence of fraud or undue influence, an agreement to pay a legal fee may be invalid if it appears that the attorney got the better of the bargain, unless [she] can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney" (*id.,* p. 929, 477 N.Y.S.2d 752, citing *Greene v. Greene*, 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 436 N.E.2d 496; *compare, Matter of Howell*, 215 N.Y. 466, 472, 109 N.E. 572; *Baye v. Grindlinger*, 78 A.D.2d 690, 432 N.Y.S.2d 624 [contracts executed after the initiation of an attorney-client relationship] ).

*Jacobson v. Sassower*, 66 N.Y.2d at 993, 499 N.Y.S.2d at 382, 489 N.E.2d 1283 (emphases added).

In the present case, if the 1993 Retainer Agreement's ambiguous bonus provision is found to apply to matters other than the then-current L & N matter, it surely appears that Cinque & Cinque will have gotten "the better of the bargain." *Id.* On the second L & N matter, for example, given Cinque's "customary hourly billing rate [of] $325.00" (1993 Retainer Agreement, second paragraph), the jury's finding that the firm was entitled to $90,000 in time charges meant that on that matter the firm had spent the equivalent of approximately 277 hours of Cinque's time. The jury's total award of $415,000 on that matter thus gave Cinque & Cinque a fee of approximately $1,500 per hour, or the equivalent of $52,000 per 35–hour workweek.

Whether the client was fully apprised of and fully understood the nature of the agreement that the attorney proposed is a question of fact for the factfinder. On remand, the district court should instruct the jury in accordance with the principle stated by the New York Court of Appeals in *Jacobson v. Sassower*.

C. *Admission of the Unenforceable February 1997 Letter*

In granting Revson's pretrial motion for partial summary judgment dismissing Cinque & Cinque's counterclaim to the extent that it sought to recover a 10 percent bonus on the basis of Revson's February 1997 Letter, the district court ruled that "to the extent that the Firm argues that it is contractually entitled to 10% of any recovery, the matter is a 'contingent fee matter,'" which the Disciplinary Rules of the Code of Professional Responsibility require the retained attorney to detail for the client in writing, Memorandum Decision dated May 3, 1999, at 2 n. 1, and it ruled that such a contract would be unen-

forceable as a matter of law, *id.* at 2–3. We agree with those rulings. Although Cinque sought to characterize Revson's reference to 10 percent in the February 1997 Letter as not a contingency-fee promise but merely an instantiation of the bonus provision of the 1993 Retainer Agreement itself, we have several difficulties with that view—even assuming that the bonus provision was understood to apply to all matters. First, the February 1997 Letter could not be viewed as an application of the 1993 Retainer Agreement with respect to the second Riviera matter, for the Letter did not mention that matter. Second, the Retainer Agreement's statement that resolution of the ultimate fee would take into account not only the time spent but also the result achieved plainly implied that any adjustment would be arrived at only after the result was known. However, even the second L & N matter, referred to in Revson's Letter, had not been concluded when that letter was written. Third, the Retainer Agreement's bonus provision was to be applicable only if Cinque & Cinque achieved "an outstanding result" or a "substantial benefit" for Revson. (1993 Retainer Agreement at 1.) In the February 1997 Letter, Revson stated that she "would give [Cinque] 10% (ten percent) of *whatever* you recover for me from L & N." (February 1997 Letter at 4 (emphasis in original).) Plainly, "whatever" would have encompassed any result, not just one that was substantial or outstanding. Thus, the February 1997 Letter was not merely an application of the Retainer Agreement; the district court correctly viewed the Letter as a quintessential contingency arrangement.

The court nonetheless allowed Cinque & Cinque to introduce the February 1997 Letter, on its quantum meruit claim, as evidence of the reasonable value of its services, and we conclude that this ruling was error.

*Quantum meruit* is a doctrine of quasi contract. . . . In order to recover in *quantum meruit*, New York law requires a claimant to establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.

*Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir.1994) (internal quotation marks omitted). Although a party seeking to establish the reasonable value of the services may present evidence as to the value that the parties placed on such services in a previous or canceled contract, *see, e.g., In re Montgomery's Estate*, 272 N.Y. 323, 326–27, 6 N.E.2d 40, 41 (1936); *see also id.* (parties' prior valuation not dispositive), we have found no New York case allowing the reasonable value of a claimant's services to be proven through evidence of an agreement that was unenforceable as a matter of law.

To the contrary, "[u]nder New York law, a contract that is unenforceable under the Statute of Frauds is inadmissible as evidence of the reasonable value of services." *Zaitsev v. Salomon Brothers, Inc.*, 60 F.3d 1001, 1004 (2d Cir.1995) ("*Zaitsev*"); *see, e.g., Isaacs v. Incentive Systems, Inc.*, 52 A.D.2d 550, 550, 382 N.Y.S.2d 69, 70 (1st Dep't 1976) ("*Isaacs*") (where contract was void under the statute of frauds, the defendant "was precluded from relying upon [it] to measure [quantum meruit] recovery"). In *Longo v. Shore & Reich, Ltd.*, 25 F.3d at 98, we held, relying on *Isaacs*, that a proposed agreement was inadmissible to show the reasonable value of the employee's services where the agreement was unenforceable simply because it had never become a contract.

All of those cases involved ordinary arm's-length negotiations leading to employer-employee relationships. In *Zaitsev* and *Isaacs*, the statute-of-frauds flaw was that the contract, unsigned by the party to be charged, was by its terms not capable of being performed within one year of the making of the contract, *see* N.Y. Gen. Oblig. Law § 5–701a.1 (McKinney 1989).

In *Longo*, the parties had evinced an intention not to be bound without a writing, and no writing had been executed by both sides. There was no fiduciary relationship between the parties, and there was no question of any ethical prohibition. Given the application of the exclusionary principle in those cases, we think that principle applies here *a fortiori*, in light of the fiduciary relationship between an attorney and his client, and the "particular scrutiny" that "courts as a matter of public policy give ... to fee arrangements between attorneys and clients," *Shaw v. Manufacturers Hanover Trust Co.*, 68 N.Y.2d at 176, 507 N.Y.S.2d at 612, 499 N.E.2d 864.

We conclude that under New York law, an attorney is precluded from showing the value of his services by introducing in evidence an agreement that he is as a matter of law ethically barred from enforcing. Accordingly, the February 1997 Letter, which the district court correctly held unenforceable as a matter of law on ethical grounds, could not properly be used as evidence of the value of Cinque & Cinque's services. At the retrial, that document, and Revson's prior oral reference to a payment of 10 percent, should be excluded.

Cinque & Cinque remains free, of course, to show the reasonable value of its services, in excess of its time charges, by other means if it can establish that Revson was informed of and understood that the 1993 Retainer Agreement's bonus provision applied to matters other than the first L & N matter.

### D. *The Argument that Cinque Invoked an Oral Contract*

 Revson contends that she should have been allowed to argue to the jury that Cinque & Cinque's request for a bonus in connection with Riviera II was an attempt to enforce an unenforceable oral agreement and hence was unethical, and that that conduct gave her cause to terminate the retainer agreement. We are unpersuaded.

In support of her contention that "when Mr. Cinque sought the bonus on Riviera from Ms. Revson, he did so on the basis of a claimed oral contract" (Revson brief on appeal at 44), Revson cites only pages 3–4 of the answer filed by Cinque & Cinque in the litigation. The cited section, however, did not refer to a claimed oral contract; rather it stated, in pertinent part, that

> on December 4th following the closing, R. Cinque had a brief discussion with Ms. Revson concerning *their longstanding arrangement that if and when the efforts of R. Cinque and his firm produced some form of extraordinary result for Ms. Revson, compensation commensurate with those efforts and the result achieved would be paid.*

(Cinque & Cinque Answer at 3, ¶ 7 (emphasis added).) It is clear that this passage referred to the fourth paragraph of the 1993 Retainer Agreement. Further, the testimony of Cinque at trial, though somewhat garbled at times because of overlapping questions, appears to have been an effort to state that oral discussions between himself and Revson with respect to a bonus for Riviera II were merely consultations envisioned by the Retainer Agreement.

Nor has our attention been called to any testimony by Revson herself that when Cinque requested a bonus for Riviera II he mentioned any supposed oral agreement. Rather, she described Cinque merely as asking for a bonus because he had obtained an outstanding result. Revson testified that on the morning after the Riviera II closing, Cinque called her and said, "I think I deserve a bonus. You know what, talk to your friends about it. Talk to your friends over the weekend, see what they think and, you know, get back to me." (Tr. 95.) She testified that after she replied that Cinque did not always achieve great results, "[Cinque] says, You know what, talk to your friends about it. So that was the end of the conversation." (*Id.*) Nor did Revson testify that Cinque mentioned any supposed oral contract in

their next and final telephone conversation on the subject of a bonus several days later. Rather, she and Cinque called each other greedy, and she told him he was fired; she sent him a letter—already prepared by Burstein—confirming the firing "within seconds of the time [she] hung up" (Tr. 110).

Thus, whatever position Cinque & Cinque may have taken in this litigation, *i.e.,* subsequent to Revson's termination of Cinque & Cinque, the record did not provide a sufficient factual basis for an argument that Revson terminated Cinque & Cinque for cause because Cinque had sought to enforce a supposed oral agreement prior to that termination.

## CONCLUSION

We have considered all of the parties' arguments on this appeal in support of their respective positions and, except to the extent indicated above, have found them to be without merit. The amended judgment is affirmed to the extent that it dismissed Revson's claim for a declaratory judgment holding that she terminated Cinque & Cinque for cause. The amended judgment is vacated to the extent that it dismissed Revson's claim for a declaratory judgment that she is not required to pay the firm a bonus in excess of its time charges and to the extent that it ruled in favor of Cinque & Cinque on its counterclaim, and the matter is remanded for further proceedings not inconsistent with this opinion.

Costs to Revson.