Rommy **REVSON**, Plaintiff–Counterclaim–Defendant–Appellant,

**Judd Burstein, Appellant,**

v.

**CINQUE & CINQUE, P.C.,** Defendant–Counterclaimant–Appellee.

**Docket Nos. 99–9427, 99–9443.**

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 2000

Decided Aug. 4, 2000

Burstein & McPherson, New York, New York (Judd Burstein, Benjamin J. Stone, New York, New York, of counsel), filed a brief for Plaintiff—Counterclaim—Defendant–Appellant.

Elkan Abramowitz, New York, New York (Elizabeth Small, Morvillo, Abramowitz, Grand, Iason & Silberberg, Burstein & McPherson, New York, New York, on the brief), for Appellant.

Robert W. Cinque, New York, New York (James P. Cinque, Cinque & Cinque, New York, New York, on the brief), for Defendant-Counterclaimant-Appellant.

Before: KEARSE, CALABRESI, and KATZMANN, Circuit Judges.

KEARSE, Circuit Judge:

These consolidated appeals challenge a supplemental judgment of the United States District Court for the Southern District of New York, Denny Chin, *Judge*, (1) ordering plaintiff Rommy Revson to pay defendant Cinque & Cinque, P.C ("Cinque & Cinque" or the "firm") costs in the amount of $3,279.42 in connection with the amended judgment in this action, which dismissed Revson's claims against Cinque & Cinque and awarded the firm $732,370 on its counterclaim against Revson for the reasonable value of legal services, and (2) ordering Revson's attorney Judd Burstein to pay Cinque & Cinque sanctions in the amount of $50,000 in connection with his conduct of the litigation. *See* 70 F.Supp.2d 415 (1999) ("*Revson I* ").

In No. 99–9443, Revson appeals from so much of the supplemental judgment as awards costs against her, contending (a) that she was not afforded adequate notice and opportunity to object, and (b) that Cinque & Cinque failed to submit an affidavit as required by 28 U.S.C. § 1924 (1994) to show that the costs it claimed were necessarily incurred. We need not explore these contentions in detail because the award of costs must be vacated in light of our decision in the companion appeal, filed today, vacating in part the amended judgment in favor of Cinque & Cinque and remanding for a new trial of one of Revson's claims and of Cinque & Cinque's counterclaim. *See Revson v. Cinque & Cinque, P.C.,* No. 99–7747 (2d Cir. Aug.4, 2000) ("*Revson II* "). We note that if costs are to be awarded to Cinque & Cinque at the conclusion of this litigation, the firm should support its request for costs in compliance with the requirements of, *inter alia,* § 1924.

In No. 99–9427, Burstein appeals from so much of the supplemental judgment as imposes sanctions on him, contending principally that (1) the conduct cited by the district court was not sanctionable, (2) the court did not provide him sufficient notice of the conduct for which he might be sanctioned, and (3) he was denied procedural safeguards to which he was entitled. For the following reasons, we conclude that the conduct relied on by the district court was not sanctionable, and we accordingly reverse the supplemental judgment to the extent that it imposed sanctions.

## I. BACKGROUND

The factual background of the contract dispute leading to this litigation is set forth in *Revson II* and will be summarized only briefly here.

### A. The Fee Dispute

From 1993 to December 1997, Revson, a patent holder, was represented by Cinque & Cinque, a New York City law firm, in

connection with various licensing and litigation matters pursuant to a March 25, 1993 agreement ("1993 Retainer Agreement" or "Agreement"). The Agreement, in the form of a letter from Robert W. Cinque ("Cinque") to Revson, stated that Cinque & Cinque would represent Revson "both as litigation counsel in your current dispute with [L & N Sales & Marketing, Inc. ('L&N')] and generally," and it set out the firm's hourly rates for its services. (1993 Retainer Agreement at 1.) It went on to state that as to "the current dispute with L & N our billing will take into account not only the amount of time spent, but also the result achieved," and that

> if we are able to achieve an outstanding result or substantial benefit for you, then our billing would be adjusted accordingly following consultation with you. We generally render statements on a monthly or other periodic basis reflecting services rendered, disbursements incurred and the amount charged.

(*Id.*)

The present litigation arose principally from a controversy with respect to the firm's fees for two matters. One was an arbitration against L & N that was ongoing in 1997–98 (the "second L & N matter"). As to that matter, Revson had written a letter in February 1997, stating that she would pay Cinque "10% (ten percent) of *whatever* you recover for me from L & N." (Letter from Revson to Cinque [and his companion Jane Klein] dated February 12, 1997 ("February 1997 Letter" or "Letter"), at 4 (emphasis in original).) The other matter involved Riviera Trading, Inc. ("Riviera"), and was a negotiation ("second Riviera matter" or "Riviera II") that resulted in an agreement executed on December 4, 1997, calling for Riviera to pay Revson a total of $2.4 million. On December 5, 1997, Cinque telephoned Revson and, in the course of the conversation, raised the subject of his fee for Riviera II. He referred to the 10 percent that Revson had mentioned in her February 1997 Letter with respect to the second L & N

matter, and he suggested that the firm deserved a fee of a "little more" than 10 percent of the amounts to be paid Revson under the second Riviera agreement. *Revson I*, 70 F.Supp.2d at 420.

Revson became upset at that suggestion and said she wanted to think about it. Thereafter, dissatisfied with one aspect of the Riviera II agreement itself, she consulted another attorney, Ronald Witkowski, who negotiated modifications of the agreement. Cinque learned of the modifications on Thursday December 11, 1997, and spoke to Revson by telephone. As described by the district court in *Revson I*, during that conversation

> [t]hey also discussed the issue of the Firm's fees for the second Riviera agreement, and the conversation became heated. Revson finally said to Cinque, "that's it, you are fired," and hung up the telephone. (Trial Tr. at 509–10). Within a minute, a fax arrived at Cinque's office; it was a letter from Revson terminating the relationship. The letter stated in part as follows:
>
> > I write to inform you that I have decided to discharge you and your firm as my counsel for all purposes (including the L & N arbitration), and replace you with Judd Burstein and the firm of Burstein & Fass LLP....
> >
> > Upon presentation of the detailed billing statement that I have been requesting for months, I will of course promptly pay all time charges and disbursements due and owing to your firm.

*Revson I*, 70 F.Supp.2d at 420 (emphasis omitted).

### B. *The Present Litigation*

On the following day, Cinque spoke by telephone with Burstein's colleague Laurie McPherson, Burstein being unavailable because he was engaged in a trial. McPherson thereafter informed Burstein that Cinque had refused to relinquish Revson's files with respect to the second L & N matter unless, *inter alia*, the firm was paid

$100,000 immediately and was promised negotiations with respect to a bonus.

On Monday morning, December 15, 1997, Cinque received a letter from Burstein dated December 14, 1997, stating in part as follows:

> I am writing to you in one last effort to avoid litigation that will inevitably tarnish your reputation and, perhaps, reduce the size of your wallet. I am therefore enclosing a copy of a complaint, still being proofread and finalized, that will be filed at Noon on December 15, 1997 unless we can reach an agreement with respect to the release of Ms. Revson's files and your claims for fees....
>
> .    .    .    .    .
>
> I apologize in advance for the harshness of this letter. I have no desire to fan the flames of an emotional dispute. Nor do I have the desire to conduct the legal equivalent of a proctology exam on your finances and billing practices. Yet, I will not hesitate to do so unless you begin to act in a responsible manner.

(Letter from Burstein to Cinque dated December 14, 1997, at 1–2 (the "proctology letter").) This was the first direct communication between Cinque and Burstein.

At noon on December 15, Cinque faxed to Burstein a four-page letter stating in part as follows:

> As I told Ms. McPherson when we spoke Friday morning ... I had a completely open mind as to how best to resolve this disagreement while at the same time avoiding unnecessary burdens and unpleasantness for Ms. Revson.
>
> It is a big mistake for Rommy through you to inflame this already sensitive situation especially where, as here, you recklessly make misstatements of fact which cry out for a public response from me in order to preserve my reputation which you threaten to tarnish.
>
> While Rommy might find this difficult to believe at this moment, I am still one of her strongest supporters and I truly regret that we had this breakdown in communication at what should have been one of the happiest times of our professional relationship....
>
> .    .    .    .    .
>
> In closing, let me say that while I find the tactics in which you have engaged as offensive as they are precipitous, and while I am prepared to litigate these horrendous accusations vigorously, I still have enough feeling for Rommy that under appropriate circumstances I would be prepared to talk with her to try and resolve a disagreement which should never have escalated to this point....
>
> .    .    .    .    .
>
> If Rommy wants to put all of this behind her quickly and as painlessly as possible, I am prepared to work with her so that we can do it. All she has to do is call me.
>
> On the other hand if she and you opt for litigation calculated to tarnish my reputation, then you and she should carefully consider the nature, basis and accuracy of each of the accusations you make against me—something that neither of you has done thus far as I assure you I shall vigorously defend myself against this outrageous conduct.

(Letter from Cinque to Burstein dated December 15, at 2–4.)

Neither Revson nor Burstein called Cinque. On receipt of Cinque's December 15 letter, Burstein's partner Robert N. Fass telephoned Cinque in "one last effort to achieve a peaceful resolution." (Affidavit of Robert N. Fass dated July 14, 1999 ("Fass Aff."), ¶ 3.) According to Fass, Cinque "literally began screaming at [him] and insulting Mr. Burstein, thereby precluding any meaningful negotiation." (*Id.* ¶ 4.)

On December 16, 1997, Revson commenced the present action seeking principally an injunction requiring Cinque & Cinque to turn over Revson's files that

were needed for the ongoing second L & N arbitration, a declaratory judgment that the firm was not entitled to a bonus with respect to Riviera II, and a declaratory judgment that Revson was not obligated to pay Cinque & Cinque any additional fees because the firm had been discharged for cause. The complaint alleged that Cinque had made professionally irresponsible threats to Revson, including threatening to withdraw as her attorney in the second L & N matter unless she paid the firm a bonus with respect to Riviera II. The matter of Cinque & Cinque's retention of Revson's files was soon resolved after Revson moved for a preliminary injunction; Revson agreed to deposit certain funds in escrow, and the firm agreed to release the files to her new attorneys.

An amended complaint was filed on January 5, 1998, dropping some allegations and the request for an injunction, and adding a claim of fraud and breach of fiduciary duty, alleging that since 1994 Cinque & Cinque had sent Revson bills based on fraudulent time charges. Cinque & Cinque counterclaimed for the fair and reasonable value of its services. It contended that the 1993 Retainer Agreement generally required Revson to pay fees based on its hourly rates plus a bonus corresponding to the result achieved, and that that formula applied not only to the first L & N matter but also to all other matters in which Cinque & Cinque represented Revson, including the second L & N matter and Riviera II.

The action was assigned to Judge Chin, who held a conference on January 9, attended by Cinque and Fass. The court expressed to Fass its "unhappiness with the [proctology] letter"; the court "did not impose any sanctions" but conveyed its "view that the language of the letter was inappropriate." *Revson I*, 70 F.Supp.2d at 423. Burstein promptly wrote letters of apology to both Cinque and the court. *See id.; see also id.* at 428–29 ("Burstein purported to apologize for his conduct at least four times, in writing, prior to trial. . . .

During trial, he purported to apologize again.").

Following the January 9 conference, Burstein promptly embarked on an aggressive course of discovery, seeking information as to Cinque & Cinque's clients, finances, and billing practices, hoping to establish that Cinque & Cinque "did not spend the time working on Ms. Revson's matters that [it] claimed to have spent" (Burstein letter to Cinque dated January 12, 1998, at 2). For example, Burstein contacted attorneys for two former Cinque & Cinque clients who had made claims or criticisms against the firm. Burstein also sought to, but eventually did not, contact then-current clients of the firm. He sought to subpoena the records of Cinque's golf club, apparently in an effort to show that Cinque had been playing golf during time that he claimed, through his billing, to have been providing services to Revson. In addition, based on a misapprehension of the increments at which Cinque & Cinque recorded its time for billing purposes, Burstein threatened to seek permission to file an amended complaint containing a civil RICO claim for fraudulent billing practices.

Eventually, the parties' respective claims were tried to a jury. The district court ruled as a matter of law that the 1993 Retainer Agreement's provision for a bonus for exceptionally good results (the "bonus provision") unambiguously applied to the second L & N matter and Riviera II—a ruling that *Revson II* reverses because that provision is ambiguous at best with respect to those matters—and the jury returned a verdict substantially in favor of Cinque & Cinque on all issues. The jury found that the firm's time charges for those two matters totaled $115,000 and that the firm was entitled to that sum plus bonuses totaling $505,000.

## C. The Imposition of Sanctions

Following the conclusion of the trial, the district court ordered Revson and Burstein to show cause why they should not be

sanctioned pursuant to Fed.R.Civ.P. 11, the Court's inherent power, and/or 28 U.S.C. § 1927 (1994) for the conduct of the litigation. Ultimately, the court decided not to impose any sanctions against Revson, noting, *inter alia*, that "Burstein has represented to the Court that he made the 'litigation decisions' in the case and that he 'was responsible for the tactics and strategies adopted during the litigation.'" *Revson I*, 70 F.Supp.2d at 434 (quoting Burstein affidavit dated July 8, 1999). The court also concluded that sanctions could not properly be imposed against Burstein pursuant to Rule 11 because the "concern [wa]s not with the filing of any particular pleading, written motion, or other paper, but with the pattern of conduct engaged in by Burstein." *Revson I*, 70 F.Supp.2d at 436 (internal quotation marks omitted).

The court concluded, however, following a lengthy discussion of standards of civility, *see id.* at 434–36, 440, 442, that Burstein should be sanctioned pursuant to § 1927 and the court's inherent power. Though noting that it could not say that Revson's claims and defenses were "'entirely without color,'" the court imposed sanctions (a) under § 1927 because of "the manner in which Burstein litigated the case," which "multiplied these proceedings and caused unnecessary injury to Cinque and the Firm," 70 F.Supp.2d at 438, and (b) under its inherent power, because "Burstein acted in bad faith and engaged in conduct for improper purposes," *id.* at 439. The court found that Burstein

> (1) ... engaged in offensive, demeaning, and abusive conduct, (2) he engaged in conduct that was extortionate in nature, (3) he multiplied these proceedings, and (4) he acted with complete and utter disregard for the harm that his actions would cause Cinque and the Firm.

*Id.* The court itemized the following 11 tactics of Burstein that it found to be "offensive and overly aggressive," and "clearly and unmistakably 'beyond the pale,'" *id.* at 417:

[1] writing a letter to Cinque threatening to "tarnish" his reputation and subject him to the "legal equivalent of a proctology exam";

[2] making a sham offer to settle by setting an unreasonable deadline for Cinque to respond and then immediately filing suit even though Cinque met that deadline by indicating a desire to discuss settlement;

[3] publicly accusing Cinque of fraud without any concrete evidence to support the claim;

[4] threatening to interfere with the Firm's other clients, including (i) conducting an investigation to identify those clients, (ii) contacting one or more of the Firm's former clients, and (iii) seeking permission to send a letter to all the Firm's clients to inquire as to "experiences, good or bad," with the Firm's billing practices;

[5] serving overly broad subpoenas, including a subpoena for all the Firm's banking records and even a subpoena seeking records from the golf course where Cinque played golf;

[6] threatening to add a RICO claim;

[7] threatening to sue Cinque individually and to seek discovery of Cinque's personal finances;

[8] threatening to send a letter to the Court accusing Cinque of criminal conduct if he did not capitulate to Revson's demands;

[9] making good on his threat to "tarnish" Cinque's reputation by contacting a reporter some weeks before trial, explaining that Revson had sued Cinque for fraudulent billing, and giving the reporter documents as well as names of former clients;

[10] engaging in unfair tactics at trial, including cross-examining Cinque in an unfair manner; and

[11] repeatedly attacking Cinque in an offensive and demeaning fashion, including calling Cinque "a lawyer who ... has acted in a manner that shames all of us in the profession," "a disgrace to the legal profession," and an example of "why lawyers are sometimes referred to as snakes," and accusing Cinque of "engag[ing] in the type of mail fraud that has led to the criminal conviction of other attorneys," being so "desperate for money he resorted to ... extortion," and being "slimy."

*Id.*

Concluding that "Burstein did not act within the bounds of the law here[; r]ather, he acted in bad faith and with reckless and utter disregard for the harm that Cinque and the Firm would suffer as a result of his 'Rambo' tactics," *id.* at 418, the court ordered Burstein to pay Cinque & Cinque $50,000 in sanctions, *see id.* at 443.

## II. DISCUSSION

On appeal, Burstein contends principally (1) that the conduct relied on by the district court was not sanctionable, (2) that the court relied on conduct as to which it had not given him sufficient notice to permit him to respond, and (3) that the sanctions were punitive, entitling him to procedural safeguards that he was not given. We need not reach the second and third contentions because, for the reasons that follow, we conclude that the conduct relied on by the district court was not sanctionable.

A. *Sanctions Standards Under § 1927 and the Court's Inherent Power*

We review all aspects of a district court's decision to impose sanctions—whether under 28 U.S.C. § 1927 or the court's inherent power—for abuse of discretion. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 154 (2d Cir.1997). A district court necessarily abuses its discretion if its conclusions are based on an erroneous de-

termination of law or on clearly erroneous factual findings. *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). We noted in *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 333 (2d Cir.1999) ("*Schlaifer Nance*"), that "[t]his abuse of discretion standard, ... is not as simple as it may appear at first blush." Although "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard that informs its determination as to whether sanctions are warranted," *Sussman v. Bank of Israel,* 56 F.3d 450, 456 (2d Cir.) (internal quotation marks omitted), *cert. denied,* 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995), "we nevertheless need to ensure that any such decision is made with restraint and discretion," *Schlaifer Nance,* 194 F.3d at 334.

The court has inherent power to sanction parties and their attorneys, a power born of the practical necessity that courts be able "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal quotation marks omitted). This power may likewise be exercised where the party or the attorney has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (internal quotation marks omitted). An award of sanctions under the court's inherent power requires both "clear evidence that the challenged actions are *entirely without color,* and [are taken] for reasons of harassment or delay or for other improper purposes[,] and a high degree of specificity in the factual findings of [the] lower courts." *Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986) (internal quotation marks omitted) (emphasis added), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). A claim is colorable

"when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980) (per curiam).

Under § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Bad faith is the touchstone of an award under this statute." *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1345 (2d Cir.1991). "Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are *so completely without merit* as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson,* 803 F.2d at 1273 (emphasis added); *id.* ("[A]n award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power....").

Thus, "[t]o impose sanctions under either authority, the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." *Agee v. Paramount Communications Inc.,* 114 F.3d 395, 398 (2d Cir.1997). With these standards in mind, we turn to the question of whether the Burstein actions on which the district court relied could properly be characterized as "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," or in pursuit of claims that were "entirely without color."

### B. *Burstein's Conduct*

Plainly the hostile tenor of this litigation gelled with Burstein's letter's reference to the legal equivalent of a "proctolo-

gy exam." Yet it is difficult to conclude that the letter constitutes grounds for sanctions. Despite the harshness of the rest of the letter, we doubt that it would have been given much attention had it referred not to proctology but, for example, to an X-ray, a CAT scan, or an MRI. Further, though the reference to proctology was offensive and distinctly lacking in grace and civility, it is, regrettably, reflective of a general decline in the decorum level of even polite public discourse. *See, e.g.,* E. Bumiller, *Mayor a Model of Restraint at an Event for Bush, N.Y. Times* March 4, 2000, at B1 (describing the Mayor of the City of New York addressing a political gathering from which he would have preferred to be absent: " 'Governor Pataki called me yesterday and said I could get a virtual colonoscopy here....' Mr. Pataki genially called the mayor's joke a 'very good line'...."). Although we, like the district court, find the reference to proctology repugnant, and Burstein himself admits it was inappropriate, we cannot conclude that that reference was sanctionable.

Nor do we see merit in the court's view that Burstein should be sanctioned on the basis that his initial letter to Cinque was not a real settlement effort but a "sham" because Burstein filed the complaint despite Cinque's professed willingness to discuss settlement. Burstein's December 14 letter stated that suit would be instituted at noon on December 15 if by then the parties could not "reach an agreement." It is undisputed that the arbitration in the second L & N matter was ongoing when Revson fired Cinque; thus Burstein's need for the files, in order to familiarize himself with and prepare for depositions then scheduled for January 7 and 8, was urgent. According to Burstein, Cinque had told Burstein's colleague three days earlier that he would not relinquish the L & N files unless the firm was immediately paid $100,000 and was promised negotiations with respect to a bonus for Riviera II. As it turned out, Cinque &

Cinque did not relinquish the files until after Revson moved for a preliminary injunction. Fass stated, in an affidavit not directly controverted by Cinque, that in the interval between the proctology letter and the commencement of suit, he had called Cinque "to make one last effort to achieve a peaceful resolution" but that Cinque "literally began screaming at [him] and insulting Mr. Burstein, thereby precluding any meaningful negotiation." (Fass Aff. at 1–2.) As the district court noted, "Revson had the right to bring suit to recover her files without making any effort to settle...." *Revson I,* 70 F.Supp.2d at 438. It hardly seems unreasonable, much less sanctionable, for counsel to move quickly to file suit to obtain urgently needed files in such circumstances.

■ Nor was the court's concern that Burstein threatened to "tarnish" Cinque's reputation a sound basis. An attorney is entitled to warn the opposing party of his intention to assert colorable claims, as well as to speculate about the likely effect of those claims being brought. In *Sussman v. Bank of Israel,* for example, we overturned Rule 11 sanctions based on the attorney's having written a prelitigation letter warning of adverse publicity if the claims were to come to public attention:

> Nor do we think it was appropriate for the district court to find that [the attorney's] prelitigation letters were evidence that the ... complaint was filed for an improper purpose. It is hardly unusual for a would-be plaintiff to seek to resolve disputes without resorting to legal action; prelitigation letters airing grievances and threatening litigation if they are not resolved are commonplace, sometimes with salutary results, and do not suffice to show an improper purpose if nonfrivolous litigation is eventually commenced.

56 F.3d at 459. Similarly, the court's concern that Burstein had in fact tarnished Cinque's reputation by speaking with a news reporter was not a proper basis for sanctions:

> [U]nless such measures are needed to protect the integrity of the judicial system or a criminal defendant's right to a fair trial, a court's steps to deter attorneys from, or to punish them for, speaking to the press have serious First Amendment implications. Mere warnings by a party of its intention to assert nonfrivolous claims, with *predictions of those claims' likely public reception, are not improper.*

*Id.* (emphasis added).

We infer that the court's charge that Burstein publicly accused Cinque of fraud without any concrete evidence to support the claim relates to the same news article, for we have seen no other instance of public statement cited in the court's opinion. Whatever the basis for that charge, however, the court stated that Revson's claim of fraudulent billing by the firm was not, so far as Burstein knew, totally lacking in color:

> I cannot conclude that the fraud claim was "utterly devoid of a legal or factual basis," from Burstein's point of view, nor can I conclude that it was unreasonable for him to believe, at least at the outset of the case, that he "could" establish fraud. Burstein had a factual basis for alleging that Cinque had breached his obligations to Revson by threatening to "abandon" her: Revson told him so. Although the jury rejected this testimony, Burstein was entitled to accept Revson's version of the facts. In addition, Revson had the right to bring suit to recover her files without making any effort to settle and she surely had the right to defend against the Firm's counterclaims. *Burstein had the right, indeed, the duty, to vigorously represent her in these respects. Hence, I conclude that Revson asserted at least some claims and defenses in this case that were "colorable."*

*Revson I,* 70 F.Supp.2d at 438 (emphases added). Given that at least some of Rev-

son's claims were colorable, Burstein's threat to make the claims public, and his speaking to a reporter about them, did not provide a basis for sanctions.

■ We also see no sanctionable conduct in Burstein's threat to bring a civil RICO claim against Cinque. Though that threat was based on Burstein's misunderstanding as to the intervals used by the firm to record time for billing purposes, Burstein was promptly enlightened as to the firm's billing practice, and he did not assert the claim. Nor do we agree with the district court's characterization of the threat of a civil RICO claim as a threat to bring criminal charges, *see Revson I,* 70 F.Supp.2d at 440, within the meaning of the Disciplinary Rules of the Code of Professional Responsibility, *see* N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.36 ("[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter"). Although Burstein's draft letter mentioned that use of the mails to perpetrate billing frauds had led to the criminal conviction of other attorneys, every viable RICO claim, whether civil or criminal, by definition involves some allegation of criminal conduct, *see* 18 U.S.C. §§ 1961–1964. If the district court's view were correct, no attorney could ever threaten to bring a civil RICO suit without violating the ethical rules.

■ Nor does the court's finding that Burstein "threaten[ed] to interfere with the Firm's other clients" provide a basis for sanctions. Though the court cites Burstein's "conducting an investigation to identify [Cinque & Cinque's] clients," Burstein states that that investigation was simply an on-line search of the "Westlaw" database; the district court made no finding to the contrary. Further, the court does not explain why contacting attorneys for two of the firm's former clients who had been critical of the firm was sanctionable, nor why it was sanctionable to "seek[ ] permission" to contact current clients, when there apparently was then no at-

tempt to contact them after permission was denied.

■ The court's charge that Burstein engaged in unfair tactics at trial likewise provides no basis for sanctions. That charge was based in part on Burstein's "cross-examining Cinque on the basis of criticism directed by [a federal judge] at Cinque's firm when Cinque was fresh out of law school and," the district court stated, "could not have had anything to do with the issue in question." *Revson I,* 70 F.Supp.2d at 439. The factual basis for the court's finding as to the nature of Cinque's involvement is hardly clear. However, when an attorney's name appears on a brief, it is not sanctionable to question him about it. Indeed, that question was not even objected to at trial.

■ The court's charge that Burstein engaged in unfair trial tactics was also based in part on Burstein's argument to the jury that Cinque had failed to call his companion Jane Klein as a witness despite Klein's having been present with Cinque and Revson at times that were important to issues in the case. The court was critical because at the start of trial Burstein had moved to have Klein excluded from the courtroom during trial, on the theory that she would be a witness. Cinque chose to have her remain and to forgo calling her as a witness. The court found it unfair of Burstein to

> forc[e] Cinque to choose between having his companion excluded from the courtroom as a potential witness or waiving his right to call her, and then, after Cinque chose the latter, ask[ ] the jury to draw an inference against Cinque because he did not call her as a witness.

*Id.* We disagree. It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse. *See, e.g., Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893) ("if a party has it peculiarly within his power to produce witnesses

82

whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable"); *N.L.R.B. v. Stark*, 525 F.2d 422, 431 (2d Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1463, 47 L.Ed.2d 734 (1976); *Scott–Paine v. Motortanker V.L. Keegan II*, 339 F.2d 422, 424 (2d Cir.1964). The missing-witness argument would have been available to Burstein even if Klein had been absent from the courtroom, if Cinque failed to call her. We see no reason why a litigant should be able to foreclose the normal inference simply by having the witness sit in the courtroom during the trial.

▆ Nor are we persuaded by the district court's reliance on Burstein's characterizations of Cinque as a disgrace to the legal profession. For example, the court commented several times on Burstein's reference to Cinque as a "snake," *see Revson I*, 70 F.Supp.2d at 417, 427, 439, and stated that

> if I were to decline to sanction Burstein in this case, I would be sending a "signal" to the bar that it is appropriate to write offensive, threatening letters to a party, that it is permissible to call adversaries "snakes" and "slimy," and that lawyers can engage in vexatious, unfair tactics with impunity. I will not send that "signal,"

*id.* at 442. We have difficulties with this rationale. First, although likening an attorney to a member of the animal kingdom may well be opprobrious, such colorful tropes are not necessarily injudicious discourse. *See, e.g., Revson I*, 70 F.Supp.2d at 417–18 (criticizing Burstein because an attorney should not be "an attack dog whose sole purpose is to destroy").

Second, the district court failed to distinguish between "adversaries" and parties, for in criticizing Burstein for referring to Cinque as a "snake[,]" and thereby "personalizing the dispute," *id.* at 439, the court cited cases that are inapposite. In *In re Dinhofer*, 257 A.D.2d 326, 328, 690 N.Y.S.2d 245, 246 (1st Dep't 1999), an at-

torney was disciplined for, *inter alia*, telling a judge, "[y]ou are corrupt and you stink." In *In re Kavanagh*, 189 A.D.2d 521, 522–23, 597 N.Y.S.2d 24, 25 (1st Dep't 1993), an attorney was disciplined for, *inter alia*, speculating that opposing counsel was linked to organized crime. In the ordinary litigated matter, the court and counsel are not involved except in their professional capacities, and irrelevant personal or *ad hominem* attacks on them merely distract from the merits of the litigation.

In the present case, it is true that Cinque was performing as an attorney; but he was representing his own firm as a party, and his own conduct as counsel to Revson was the subject of Revson's claims. Thus, Cinque's performance as a lawyer was at issue. The dispute is necessarily personalized with respect to a party whose performance of his own contractual obligations is claimed to have been unethical and to have provided cause for termination.

Finally, we think the district court's view of the propriety of any characterization of Cinque's conduct as shameful must have been influenced by the court's view of the scope of the bonus provision in the 1993 Retainer Agreement—a view we have overruled in *Revson II*. The district court ruled that the bonus provision unambiguously as a matter of law required Revson to pay the firm a bonus for an exceptionally good result in any matter. In light of our rejection of that ruling in *Revson II*, we think it plain that the claims Burstein pursued on Revson's behalf were not "entirely without color," *Oliveri v. Thompson*, 803 F.2d at 1272 (internal quotation marks omitted), or "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," *id.* at 1273.

In sum, conduct cited by the district court as grounds for the imposition of sanctions, individually or in the aggregate does not in our view support the sanctions imposed.

## CONCLUSION

We have considered all of the arguments in support of sanctions and have found them to be insufficient. The supplemental judgment of the district court is vacated insofar as it imposed costs on Revson and is reversed insofar as it imposed sanctions on Burstein.

No costs.