# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK E. MEYERS et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 9878-VCL |
| | ) | |
| QUIZ-DIA LLC et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| QUIZ-DIA LLC et al., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROCKFORD MANAGER LLC et al., | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 21, 2016
Date Decided:  January 9, 2017

John T. Dorsey, Richard J. Thomas, Emily V. Burton, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Bruce S. Bennett, Christopher Lovrien, Nathaniel P. Garrett, Sarah G. Conway, JONES DAY, Los Angeles, California; *Counsel for Plaintiffs*.

Brock E. Czeschin, Blake Rohrbacher, Susan M. Hannigan, Elizabeth A. DeFelice, Brian F. Morris, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Counsel for Defendants and Third-Party Plaintiffs*.

**LASTER, V.C.**

Twelve plaintiffs previously affiliated with the Quiznos family of companies have sued three Quiznos entities for indemnification and advancement under multiple agreements. Many of their claims turn in the first instance on whether the three entities assumed any obligations to provide indemnification or advancement under an Assignment, Assumption, and Release Agreement dated as of January 24, 2012 (the "Assignment Agreement"). This decision holds that the entities did not assume any obligations to provide indemnification or advancement. Summary judgment on this issue is granted in favor of the entities.

## I. FACTUAL BACKGROUND

The parties have filed cross motions for summary judgment. They have not argued that there are any issues of fact material to the disposition of either motion. In this situation, Rule 56(h) contemplates that the court "shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." The following facts are drawn from the record submitted with the motions.

### A. The Quiznos Family Of Companies

The first Quiznos sandwich restaurant opened in Denver, Colorado in 1981. In 1991, members of the Schaden family purchased the Quiznos name and other assets and formed what later became known as The Quiznos Corporation ("Old Quiznos"). In 1994, Old Quiznos completed an initial public offering and became a NASDAQ listed company. In December 2001, members of the Schaden family and plaintiff Patrick E. Meyers led a transaction that took the business private again.

1

After the going-private transaction and until a restructuring in 2012, the ultimate parent entity in the Quiznos family of companies was QCE Holding, LLC ("Old Holding"). The pivotal entity in the Quiznos structure for purposes of this decision was QCE LLC ("QCE"), an indirect subsidiary of Old Holding. Through over seventy subsidiaries, QCE conducted the business of the Quiznos sandwich shop empire. Three QCE subsidiaries are defendants in this action: Quiz-DIA LLC, Quizmark LLC, and QCE Gift Card LLC (together, the "Subs").

The individual plaintiffs were members of the Board of Managers of Old Holding (the "Board") or senior officers of QCE before the 2012 restructuring. The members of the Board were plaintiffs Richard E. Schaden, Richard F. Schaden, Frederick H. Schaden, Meyers, Andrew R. Lee, John M. Moore, and Thomas C. Ryan (together, the "Board Plaintiffs"). The senior officers were plaintiffs Greg MacDonald and Dennis Smythe (jointly, the "Officer Plaintiffs"). MacDonald served as CEO of QCE and in that capacity was responsible for running the entire Quiznos organization. Smythe served as CFO of QCE and was responsible for maintaining the organization's books and records and reporting on its financial condition.

**B.      The Leveraged Recapitalization**

In 2006, the Schadens and other then-existing owners of Old Holding, including Meyers, sold 49% of the equity in Old Holding to affiliates of J.P. Morgan Partners, LLC as part of a leveraged recapitalization (the "Leveraged Recap"). Through the Leveraged Recap, the Schadens, Meyers, and other participating owners of Old Holding received aggregate proceeds of $585 million.

To fund the Leveraged Recap, QCE borrowed a total of $875 million. QCE's direct parent entity, QCE Finance LLC ("Finance"), guaranteed QCE's borrowings. An intermediate holding company called QCE Incentive LLC ("Incentive") owned 98% of Finance (the remaining two percent was owned by members of QCE management). Old Holding owned 100% of Incentive. Consequently, after the Leveraged Recap, the Quiznos ownership structure looked roughly like this:



## C. The Restructuring

The Leveraged Recap closed shortly before the Great Recession. By that point, Quiznos' business had peaked at approximately 5,200 franchised locations. Between 2007 and 2011, the number of franchises fell to approximately 3,000. The resulting drop in franchisee income caused QCE's adjusted EBITDA to decline, tripping its loan covenants.

By 2012, funds associated with Avenue Capital Management II, L.P. (collectively, "Avenue") and funds associated with Fortress Investment Group LLC (collectively, "Fortress") owned substantial portions of QCE's debt. It is not clear whether Avenue and Fortress subscribed as part of the Leveraged Recap or acquired the debt afterwards. Nor does it matter. What mattered at the time was that by 2012, Avenue and Fortress owned 33% of QCE's first-lien facility and 72% of its second-lien facility.[1] They were in a position to declare a default under the loan agreements and pursue remedies as creditors.

Instead, Avenue sponsored a complex out-of-court restructuring (the "Restructuring"). The following aspects of the Restructuring are important for this decision.

- The first-lien lenders received (i) payment in cash of all accrued but unpaid interest on the first-lien loan, (ii) a pro rata share of a payment of $75 million in principal, and (iii) revised loan terms.

---

[1] *See, e.g.*, Ex. Q at 4 of 20. Both sides submitted transmittal affidavits that attached numerous exhibits. Citations to exhibits designated by letter (*e.g.*, Ex. Q) are attached to the Transmittal Affidavit of Richard J. Thomas. Citations to exhibits designated by number (*e.g.*, Ex. 9) are attached the Transmittal Affidavit of Blake Rohrbacher.

4

- The second-lien lenders gave up their debt claims in exchange for what would equate to an approximately 40% ownership stake in Finance.

- Avenue contributed $150 million to Finance in return for a 60% equity stake.

- Incentive's member interests in Finance were cancelled, leaving Avenue and the former second-lien lenders as the owners of all of Finance's equity.[2]

In practical terms, the Restructuring transferred ultimate ownership of the Quiznos family of companies from entities affiliated with the Schadens, Meyers, and JP Morgan (collectively, the "Old Quiznos Owners") to entities affiliated with Avenue, Fortress, and the other second-lien lenders.

The Restructuring required lender consent. When they were negotiating the Restructuring, Avenue and the Old Quiznos Owners did not know if they could obtain the necessary approvals. As a backup, they prepared bankruptcy filings for a reorganization under Chapter 11 of the Bankruptcy Code. The terms of the Plan of Reorganization paralleled the Restructuring, except Avenue would receive 75% of the post-transaction equity in Finance instead of 60%, and the first-lien lenders would receive a payment of $65 million in principal rather than $75 million.

The Restructuring received the necessary consents and closed on January 24, 2012. Avenue received 60% of the equity in return for its $150 million capital contribution.

---

[2] The actual transaction was even more complex. The second-lien lenders actually exchanged their debt for member interests in a new entity, QCE Parent LLC ("Parent"), which received the 40% interest in Finance. Parent then merged with Finance, survived the merger, and changed its name to Finance. QCE thus continued to be owned by Finance after the Restructuring, but it was the successor entity following the merger of Parent and the entity formerly known as Finance.

Because Avenue and Fortress owned a supermajority of the second-lien debt, they received the bulk of the equity that went to the second-lien holders. In total, after the Restructuring, Avenue owned 72% of the equity, Fortress owned 16%, and various others owned the remaining 11.3%. *See* Ex. 2. Post-Restructuring, the Quiznos ownership structure looked roughly like this:



After the Restructuring, Old Holding and Incentive dissolved. As a result, the Board Plaintiffs lost their board seats. The Officer Plaintiffs initially kept their positions, then were replaced in July 2012.

**D.     The Plaintiffs' Indemnification And Advancement Rights**

Before the Restructuring, the plaintiffs held various rights to indemnification and advancement from various entities in the Quiznos family of companies. Three sets of rights are relevant to the current dispute:

- The Board Plaintiffs and the Officer Plaintiffs possessed rights under Old Holding's Third Amended and Restated Limited Liability Company Agreement (the "Old Holding Agreement").

- The Board Plaintiffs and the Officer Plaintiffs possessed rights under Incentive's Second Amended and Restated Limited Liability Company Operating Agreement (the "Incentive Agreement").

- Each of the Board Plaintiffs was a party to a separate Manager Indemnification Agreement with Old Holding (together, the "Indemnification Agreements").

When negotiating the Restructuring, the plaintiffs understood that that Old Holding and Incentive were giving up their ownership interest in the Quiznos family of companies and would dissolve. They therefore bargained to preserve their indemnification and advancement rights. The parties entered into the Assignment Agreement to address the extent to which the plaintiffs' indemnification and advancement rights would continue.

Among other provisions, the Assignment Agreement stated that "QCE hereby accepts, assumes, takes over and succeeds to, all Indemnity Obligations of QCE Holding LLC and QCE Incentive." Ex. 3, §1(c). The parties disagree about which entities assumed responsibility for the plaintiffs' indemnification and advancement rights. The plaintiffs contend that QCE and all of its subsidiaries, including the Subs, assumed responsibility for their indemnification and advancement rights. The Subs contend that only QCE assumed that responsibility.

7

**E.      The Franchisee Actions**

Beginning in late 2012, various Quiznos franchisees filed lawsuits in Colorado state court against the two Richard Schadens, Meyers, Old Holding, Incentive, and Finance (the "Franchisee Actions"). The franchisees alleged that the defendants had engaged in fraudulent transfers that siphoned millions of dollars out of the Quiznos entities.

By letter dated December 31, 2012, Meyers wrote the chief legal officer of QCE and requested indemnification and advancement on behalf of the defendants in the Franchisee Actions. He invoked the defendants' rights to indemnification and advancement under the Old Holding Agreement and their Indemnification Agreements. He asked for indemnification and advancement from "the Company," which he defined in his letter as QCE "and its respective affiliated parties." Ex. 19.

By letter dated January 15, 2013, QCE's chief legal officer responded to Meyers' letter. He informed Meyers that the law firm of Cheng Cohen LLC would represent "all defendants that are the responsibility of [QCE] and its respective affiliated parties." *Id.*

On January 23, 2013, another franchisee filed an additional action. Meyers wrote to QCE's chief legal officer to demand indemnification and advancement for the additional action. He further stated,

> While the engagement of . . . Cheng Cohen LLC . . . is satisfactory to each of Indemnified Individuals [sic] at this time, each such individual reserves the right to employ his own counsel at the Company's expense if he reasonably concludes that there may be a conflict of interest between the Company and himself in the conduct of the defense . . , in accordance with Section 14(e)(ii) of each Indemnification Agreement.

8

Ex. 20. Meyers did not separately define the term "Company," but he and QCE's chief legal officer had been using the term to mean QCE and its affiliated entities, which was how Meyers initially used it in his letter dated December 31, 2012.

Cheng Cohen entered an appearance in the Franchisee Actions on behalf of Old Holding, Incentive, and Finance. The firm did not enter an appearance on behalf of the individual defendants.

### F. Avenue And Fortress Threaten Litigation.

In July 2013, representatives of Avenue and Fortress (together, the "Funds") summoned Smythe and Meyers to a meeting in New York City. At the meeting, the Funds' representatives told Smythe and Meyers that they "were unhappy about the results of the [Restructuring] and . . . were going to ask [them] to do something about it."

In August 2013, representatives of the Funds summoned MacDonald to a meeting in Denver. He answered questions about the Restructuring for two hours.

Before attending the meetings, Smythe, Meyers, and MacDonald retained Jones Day to investigate the potential claims that the Funds might bring against them. On August 26, 2013, Smythe entered into an indemnification agreement with plaintiff Consumer Capital Partners, LLC ("Consumer Capital"), a company owned indirectly by the Schadens. Pursuant to that agreement, Consumer Capital agreed to indemnify Smythe for "all Expenses and Liabilities incurred or paid by" Smythe "in connection with [any] Proceeding" to which Smythe was "a party or [was] threatened to be made a party . . . by reason of [his] Company Status," defined as his status as "an officer, director, member, partner, advisory board member, employee or agent of [an affiliate of Consumer Capital]

9

and Quiznos." Ex. 16, §§ 1(b), 3(a). Approximately a year later, on June 17, 2014, Consumer Capital agreed to indemnify MacDonald on the same terms.

## G.     QCE And Many Of Its Affiliates—But Not The Subs—File Bankruptcy.

On March 14, 2014, QCE and many of its affiliates—but not the Subs—pursued a prepackaged reorganization under Chapter 11. The disclosure statement for the prepacked bankruptcy represented that "[t]he Reorganized Debtors, Avenue and Fortress will enter into [a] Specified Litigation Agreement" to pursue "Specified Litigation Claims" against the plaintiffs. Ex. O, at 8 of 265. The Plan of Reorganization defined the term "Specified Litigation Claims" broadly to encompass "all claims and causes of action made, or which could be made, on behalf of the Debtors, Avenue and/or Fortress against" the plaintiffs. *Id.* at 85 of 265. An exhibit to the disclosure statement, however, stated that the Funds intended to pursue "any claims and rights they or their affiliates may have against former management and former owners of the Company relating to the Company's previous restructuring and any forecasts, projections, models, representations, or warranties made or provided in connection therewith . . . ." *Id.* at 207 of 265.

On May 12, 2014, the bankruptcy court confirmed the Plan of Reorganization. The confirmation order discharged the pre-petition claims against QCE and the other debtors, including all claims against QCE under the Assignment Agreement.

For reasons that the parties dispute, and which are not material to this decision, the Subs did not file for bankruptcy. Consequently, to the extent they assumed obligations under the Assignment Agreement, the confirmation of the plan did not discharge them.

**H.      Settlement In The Franchisee Actions**

In March 2014, Meyers and the two Richard Schadens settled the Franchisee Actions for $2.5 million. A dispute exists over whether the Subs have a defense to any obligation to provide indemnification for the settlement on the grounds that Meyers and the Schadens failed to obtain prior written consent from QCE, as the Assignment Agreement contemplates. It is clear that Meyers and the Schadens did not obtain actual prior written consent from QCE or the Subs. Meyers has averred in response that he "personally informed counsel for Quiznos of the settlement-in-principle the day the agreement was reached" and that the unidentified "counsel for Quiznos" did not object. Meyers Aff. ¶ 14. Meyers and the Schadens also have pointed out that when the parties informed the court of the settlement the next day, no one objected. Of course, neither QCE nor the Subs were parties to the litigation, and none of them consented either.

By letter dated July 1, 2014, the Board Plaintiffs, the Officer Plaintiffs, and certain of their affiliated entities demanded indemnification and advancement from each of the Subs. The plaintiffs relied on the Assignment Agreement. They sought to recover the fees, costs, expenses, and liabilities they had incurred in the Franchisee Actions, including the amounts incurred under the Settlement Agreement. They also sought to recover the expenses they had incurred in preparing for a potential litigation that Avenue and Fortress had indicated they would assert under the Specified Litigation Agreement.

The plaintiffs asked the Subs to respond to their request within ten days. On July 10, 2014, before the ten days had passed, the plaintiffs filed this action (the "Delaware Action").

11

## I.       The Colorado Action

On July 22, 2014, twelve days after the plaintiffs filed the Delaware Action, the Funds followed through on their threats to sue the plaintiffs for their alleged misconduct in connection with the Restructuring. The Funds sued the Board Plaintiffs, the Officer Plaintiffs, Consumer Capital, and plaintiff Cervantes Capital LLC in the United States District Court for the District of Colorado (the "Colorado Action"). The Funds alleged that the financial projections for the Restructuring "made it appear that the debt burden and capital structure that would remain in place post-[Restructuring] would be sustainable and appropriate," that the projections were false or misleading, and that the defendants sued in the Colorado Action should be held liable as a result. Ex. 45, ¶ 65.

In their next demand for indemnification and advancement, the plaintiffs added a demand for advancement for the Colorado Action. When the Subs denied their request, the plaintiffs included advancement for the Colorado Action as part of the relief sought in the Delaware Action. As the Delaware Action progressed, the plaintiffs continued to update their demands for indemnification and advancement, which now encompassed fees and expenses incurred in connection with the Franchisee Actions, fees and expenses incurred in investigating the potential Specified Litigation Claims, and fees and expenses incurred defending the Colorado Action.[3]

---

[3] On September 17, 2015, the United States District Court for the District of Colorado granted a motion to dismiss the Colorado Action. The Funds appealed, but the plaintiffs sought indemnification, claiming incorrectly that the trial-level dismissal constituted a final disposition for purposes of indemnification. On November 30, 2016, this court dismissed that aspect of the plaintiffs' indemnification claims as premature. Since

**J.      The Cross Motions**

On June 22, 2016, the Subs moved for summary judgment in the Delaware Action. Among other arguments, they contended that they have no obligations to indemnify the plaintiffs under the Assignment Agreement. The plaintiffs cross-moved for summary judgment on a variety of issues of their own, including the scope of the Assignment Agreement.

## II.      LEGAL ANALYSIS

Summary judgment may be granted when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). Because the parties have not argued that there are any issues of fact material to the disposition of either motion, Court of Chancery Rule 56(h) governs, and "the usual standard of drawing inferences in favor of the nonmoving party does not apply." *Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 18 (Del. Ch. 2005).

The parties agree that the obligations covered by the Assignment Agreement encompass the rights to advancement and indemnification that existed under the Old Holding Agreement, the Incentive Agreement, and the Indemnification Agreements. The parties also agree that QCE assumed those obligations. The question is whether any of the Subs also assumed those obligations. If they did, then the plaintiffs can pursue their claims

then, the United States Court of Appeals for the Tenth Circuit has affirmed the dismissal, prompting the plaintiffs to move to vacate the dismissal of their indemnification claims. That motion will be addressed separately.

against the Subs, subject to numerous other defenses that the Subs have raised. If the Subs did not also assume the obligations covered by the Assignment Agreement, then the Subs are entitled to summary judgment on the claims that depend on the Assignment Agreement as a means of reaching the Subs.

## A. Principles Of Contract Interpretation

The parties selected New York law to govern the Assignment Agreement. Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citations omitted). Because "[t]he best evidence of what parties to a written agreement intend is what they say in their writing," a "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* (citations omitted). Thus, "[t]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

The Subs previously moved to dismiss the plaintiffs' claims on the theory that the plain language of the Assignment Agreement established that only QCE assumed obligations under its terms. The court rejected this argument, reasoning as follows:

> The Assignment Agreement is reasonably susceptible to more than one interpretation. The first sentence of the Assignment Agreement states that it is "by and among" the parties, including "QCE, LLC, a Delaware limited liability company ('QCE') (on behalf of itself and each of its direct and indirect subsidiaries)." The plaintiffs argued that, pursuant to this language, QCE undertook obligations under the Assignment Agreement "on behalf of itself and each of its direct and indirect subsidiaries," such that when the agreement references QCE or QCE LLC, the obligation runs not only to that entity but also to "each of its direct and indirect subsidiaries" [*i.e.*, the

defendants]. The defendants argued that the same language means only that QCE had the authority to bind itself and each of its direct and indirect subsidiaries, with other specific provisions of the contract determining whether or not a particular entity was bound. The defendants argued that a reference to QCE or QCE LLC in a specific provision of the agreement only imposes an obligation on QCE, not on QCE "itself and each of its direct or indirect subsidiaries" unless the provision states that the obligation was assumed by QCE on behalf of "itself and each of its direct and indirect subsidiaries." The language is reasonably susceptible to both interpretations.

Dkt. 30, ¶ 2. That ruling is law of the case. *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.").

When a contract is ambiguous, a court may look to extrinsic evidence as an aid to interpretation. *Banos v. Rhea*, 33 N.E.3d 471, 475 (N.Y. 2009). A court applying New York law should not read individual words or provisions in isolation, but rather in light of the "plain purpose and object" of the agreement. *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998); *see Niagara Frontier Transp. Auth. V. Euro-United Corp.*, 757 N.Y.S.2d 174, 176 (N.Y. App. Div. 2003). Moreover, "[t]he entirety of the agreement" should be read "in the context of the parties' relationship." *In re Riconda*, 90 N.Y.2d 733, 738 (N.Y. 1997).

**B.     The Language Of The Assignment Agreement**

In pertinent part, the Assignment Agreement provides as follows:

This ASSIGNMENT, ASSUMPTION AND RELEASE AGREEMENT, dated as of January 24, 2012 (this "Agreement"), is by and among QCE Holding LLC, a Delaware limited liability company ("QCE Holding"), QCE Parent LLC, a Delaware limited liability company ("QCE Parent"), QCE Incentive LLC, a Delaware limited liability company ("QCE Incentive"), QCE Finance LLC, a Delaware limited liability company ("QCE Finance") (on behalf of itself and each of its direct and indirect subsidiaries), QCE LLC,

15

a Delaware limited liability company ("QCE") (on behalf of itself and each of its direct and indirect subsidiaries), each of the entities listed on Schedule I hereto as a Company Party (each, a "Company Party," and collectively, the "Company Parties"), each of the persons listed on the signature pages hereto as an Indemnitee (each, an "Indemnitee" and, collectively, the "Indemnitees") and the existing members of QCE Holding as set forth on Schedule II hereto (each, an "Existing Member" and, collectively, the "Existing Members").

. . .

WHEREAS, the [related Restructuring Support Agreement] contemplates the assumption by QCE of all indemnification provisions and agreements currently in place for current and former directors, officers, managers, members, employees and agents of QCE Holding, QCE Finance, QCE and its subsidiaries and of current and former members of the Board of Managers of QCE Holding;

WHEREAS, in order to fulfill its obligations under the [Restructuring Support Agreement] and to facilitate the Restructuring, QCE desires to assume from QCE Holding and QCE Holding will assign to QCE all of the Assumed Agreements and Indemnity Obligations (defined below); and

WHEREAS, pursuant to the [Restructuring Support Agreement] and to facilitate the Restructuring, the parties hereto desire to exchange mutual releases of liability for all claims arising on or prior to the Effective Date (as defined in the [Restructuring Support Agreement]).

. . .

1.      Assignment and Assumption

(a)      QCE Holding hereby assigns, transfers and conveys to QCE all of QCE Holding's right, title and interest in and to the Assumed Agreements.

(b)      QCE hereby accepts, assumes, takes over and succeeds to all of the right, title and interest in and to QCE Holding under the Assumed Agreements, and QCE hereby covenants and agrees to discharge, perform and comply with, and to be bound by, all the terms, conditions, provisions, obligations, covenants and duties of QCE Holding under (and any liabilities arising out of) the Assumed Agreements from and after the date hereof as if QCE were any original party thereto. For the avoidance of doubt, from and after the date hereof (i) any reference to QCE Holding LLC in each Assumed

16

Agreement shall be construed as a reference to QCE LLC, (ii) QCE Holding shall have no responsibilities under the Assumed Agreements except as set forth in Section 2 and Section 3 below, and (iii) the Indemnitees shall have the right to enforce any and all claims (for liabilities, performance or otherwise, whether existing prior to or arising on or after the date hereof) under the Assumed Agreements against QCE and shall look solely to QCE for any such claims under the Assumed Agreements.

      (c)     QCE hereby accepts, assumes, takes over and succeeds to, all Indemnity Obligations of QCE Holding LLC and QCE Incentive. As used in this Agreement, "Indemnity Obligations" shall mean any and all respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements or any combination of the foregoing, of QCE Holding and QCE Incentive to indemnify and reimburse persons who are current or former directors, officers, members, managers, managing members, employees or agents of any of the Debtors.

     3. Releases

      (a)     Mutual Releases. . . . QCE, on behalf of itself and all of its direct or indirect subsidiaries . . . shall be deemed to and shall unconditionally and irrevocably . . . release [the other parties to the Assignment Agreement] from any and all claims, obligations, . . . causes of action and liabilities whatsoever, . . . [except] the foregoing releases shall not apply to claims arising from unlawful acts.

Ex. 3, at 1, §§ 1(a)–(c), 3(a). The release carves out "QCE and the Indemnitees solely with respect to the Assumed Agreements and after giving effect to the assignment and assumption contemplated by Section 1 of this Agreement." *Id.*

The critical language is the definition of QCE, which states: "QCE LLC, a Delaware limited liability company ('QCE') (on behalf of itself and each of its direct and indirect subsidiaries)." The Subs contend that this language defined "QCE" to mean "QCE LLC and only QCE LLC." Under their view, the parenthetical phrase "(on behalf of itself and each of its direct and indirect subsidiaries)" meant that QCE had the authority to bind its

17

subsidiaries to the Assignment Agreement, but not that its subsidiaries undertook obligations co-extensive with QCE's. It was left to other provisions in the Assignment Agreement to determine whether or not any particular subsidiary actually undertook any particular obligation. Under this reading, if a provision of the Assignment Agreement only referenced QCE, then only QCE undertook the obligation. But if a provision referenced QCE and its subsidiaries, then QCE and its subsidiaries undertook the obligation.

The plaintiffs contend that the Assignment Agreement defined "QCE" to mean "QCE LLC and all of its direct and indirect subsidiaries." Under their interpretation, the definition of QCE included the parenthetical phrase "(on behalf of itself and each of its direct and indirect subsidiaries)." Thus, any reference to "QCE" in the agreement also referred to QCE's subsidiaries, including the Subs.

Read in isolation, both interpretations remain reasonable. The drafting history and context, however, support only one reasonable interpretation. The Subs' interpretation is consistent with the parties' intent. The plaintiffs' interpretation is not.

## C.    The Drafting History And Context

The Assignment Agreement was prepared during the negotiation of the Restructuring. The Assignment Agreement documented two separate deal points: (i) a release of any claims that the post-Restructuring entities might have against the sell-side parties (the "Release Provision") and (ii) the assumption and continuation of indemnification rights (the "Indemnification Provision").

The Assignment Agreement was drafted late in the process. The parties first negotiated a Restructuring Support Agreement, which was the overarching document that

18

governed the Restructuring. They also prepared other documents, including (i) a Subscription Agreement and (ii) the Plan of Reorganization for the bankruptcy alternative.

During the negotiation and preparation of the critical documents, the parties were represented by counsel. Akin Gump Strauss Hauer & Feld LLP represented Avenue. Paul, Weiss, Rifkind, Wharton & Garrison LLP formally represented Old Holding and all of its affiliates, including the Subs. As a practical matter, they represented the interests of the Old Quiznos Owners, the Board Plaintiffs, and the Officer Plaintiffs. Meyers, who is also a lawyer, participated directly in the negotiations on behalf the Old Quiznos Owners, the Board Plaintiffs, and the Officer Plaintiffs.

### 1.     The Restructuring Support Agreement And Term Sheet

The key terms of the Assignment Agreement started out as points in a term sheet that became an exhibit to the Restructuring Support Agreement (the "Restructuring Term Sheet"). For purposes of the Restructuring Term Sheet, the defined term "QCE" referred only to QCE. The defined term "Holdco" referred to Finance. An additional defined term, "the Company," referred to Finance and its direct and indirect subsidiaries. The relevant sections of a table from the final term sheet appear below:

| Company | QCE LLC ("*QCE*"), a Delaware limited liability company |
|---|---|
| Holdco | QCE Finance LLC ("*Holdco*" and together with its direct and indirect subsidiaries, the "*Company*"), a Delaware limited liability company |

Ex. 27, Ex. A, at 1

19

Notably, this table purports to define "Company" in two places. In the left column of the first row, "Company" appears to refer to "QCE." In the right column of the second row, however, "Company" is defined specifically to mean "Holdco and . . . its direct and indirect subsidiaries." Moreover, at times the Restructuring Term Sheet uses language that is inconsistent with both definitions. For example, at one point the Restructuring Term Sheet refers to "QCE LLC, the Company and their subsidiaries." *See, e.g.*, *Id.*, Ex. A, at 12. If "Company" meant "QCE," then using both was superfluous. If "Company" meant Holdco and its direct and indirect subsidiaries, then the references to QCE and the subsidiaries were superfluous. To resolve the ambiguity, I have considered the documents as a whole and taken into account Meyers' deposition testimony, where he explained that the bolded terms embedded in the right-hand column were the ones the parties used, such that the term "Company" meant Finance and all of its direct and indirect subsidiaries, including QCE and the Subs. *See* Ex. 66, at 121–27 (Meyers Deposition). The resulting definition of "Company" comports with how the final Restructuring Support Agreement uses the term. *See* Ex. 27, at 1. The resulting definition of "Holdco" comports with what Meyers believed the term to mean at the time of drafting. *See* Ex. 36, at MEYERS_00027900 (handwritten comment from Meyers stating "I believe Holdco in the [Restructuring Term Sheet] is [Finance]").

Work on the Restructuring Term Sheet began in November 2011. Akin Gump circulated the initial draft, which was dated November 5, 2011. Its version of the Indemnification Provision provided as follows:

> Assumption/continuation of all indemnification provisions currently in place for current and former directors, officers, managers, employees and agents of Holdco, the Company and their subsidiaries. The Company shall continue to maintain D&O insurance for current and former directors, officers, managers, employees and agents and purchase "tail" coverage for any such insurance that terminates.

Ex. 24, at MEYERS_00039183 (blacklined changes removed). Its version of the Release Provision stated:

> To the extent permitted by applicable law, the Restructuring shall include a full release from liability in favor of the Company, the Existing Lenders, and all current and former members, officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, and professionals) of the Company and the Existing Lenders from any claims and causes of action related to [the] arising on or prior to the Effective Date[, except for any claims and causes of action for gross negligence, willful misconduct or fraud.]

*Id.* (blacklined changes removed; brackets in original).

Both Paul Weiss and Meyers commented on the November 5 draft. Paul Weiss created a blacklined version dated November 29, 2011, that incorporated its comments. Paul Weiss revised the Indemnification Provision to add the term "members" to the list of indemnified parties and change the provision to require continuation of both "D&O and E&O" insurance. The blacklined provision appeared as follows:

> Assumption/continuation of all indemnification provisions currently in place for current and former directors, officers, managers, **members,** employees and agents of Holdco, the Company and their subsidiaries. The Company shall continue to maintain D**&O and E**&O insurance for current and former directors, officers, managers, employees and agents and purchase "tail" coverage for any such insurance that terminates.

*Id.* Paul Weiss made more significant changes to the Release Provision, which appeared in blacklined form as follows:

21

To the **full** extent permitted by applicable law, the Restructuring shall include a full release from liability in favor of **the** [sic] **QCE Holding, QCE Incentive,** the Company, the Existing Lenders, and all current and former members, **managers,** officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (including their respective officers, directors, employees, members, **managers** and professionals) of **QCE Holding, QCE Incentive,** the Company and the Existing Lenders from any claims and causes of action related to [~~the~~]**or** arising on or prior to the Effective Date[~~, except for any claims and causes of action for gross negligence, willful misconduct or fraud.~~]**. The Existing Equity Holders shall also exchange a full release as to any claims that may exist between the Existing Equity Holders.**

*Id.*

Meyers made handwritten comments on the Paul Weiss markup. In the margin, he wrote "How effectuated?" and drew lines to both the Indemnification Provision and the Release Provision, showing that his question related to both. He did not make other changes to the Release Provision. He revised the Indemnification Provision to add the words "by Holdco" and to identify specifically "all other current and former members of the Board of Managers of QE Holding." *Id.* As edited by Meyers, the provision read as follows:

Assumption/continuation **by Holdco** of all indemnification provisions currently in place for current and former directors, officers, managers, members, employees and agents of Holdco, the Company and their subsidiaries **and of all current and former members of the Board of Managers of QCE Holdings** [viz., Old Holding]. The Company shall continue to maintain D&O and E&O insurance for current and former directors, officers, managers, employees and agents and purchase "tail" coverage for any such insurance that terminates.

*Id.* (emphasis showing Meyers' comments added; emphasis showing Paul Weiss' comments omitted).

The changes that Paul Weiss and Meyers made show they were focused on particular entities in the Quiznos' capital structure. Although Paul Weiss did not make changes to the Indemnification Provision, the firm revised the Release Provision to add Old Holding and Incentive, which would not have been picked up by the definitions of "the Company." Meyers specifically added "by Holdco" to the Indemnification Provision. According to the definitions that the parties were using, this meant Meyers wanted the indemnification rights to be assumed by Finance. That entity would be the ultimate parent entity after the Restructuring, corresponding to Old Holdings before the Restructuring. Most of the plaintiffs' indemnification rights ran to Old Holdings, so it made sense for Meyers to want to those rights to continue at the same level. Notably, Myers did *not* use the defined term "Company," which would have indicated that he wanted Finance and all of its direct and indirect subsidiaries to assume the rights.

Paul Weiss combined the comments and sent Akin Gump a markup dated December 1, 2011. Akin Gump responded with a version dated December 9. Akin Gump accepted the edits to the Indemnification Provision and revised the Release Provision as follows:

> To the ~~full~~fullest extent permitted by applicable law, the Restructuring shall include a full release from liability in favor of the [sic] QCE Holding, QCE Incentive, the Company, the Existing Equity Holders, the Existing Lenders, and all current and former members, managers, officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives (including their respective officers, directors, employees, members, managers, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) of QCE Holding, QCE Incentive, the Company, the Existing Equity Holders and the Existing Lenders from any claims and causes of action related to or arising on or prior to the Effective Date, except for any claims and causes of action for gross negligence, willful

misconduct or fraud. The Existing Equity Holders shall also exchange a full release as to any claims that may exist between the Existing Equity Holders.

Ex. 25, at MEYERS_00009740.

After these exchanges, the parties continued to engage in discussions regarding the Restructuring Term Sheet. Paul Weiss prepared the next iteration, which was dated December 15, 2011. It was marked against the previous draft and reflected the parties' additional discussions.

Critically, the Paul Weiss draft revised the Indemnification Provision to substitute "QCE LLC" for "Holdco" in the Restructuring Term Sheet. The markup read as follows:

> Assumption/continuation by [~~Holdco~~]**QCE LLC** of all indemnification provisions **and agreements** currently in place for current and former directors, officers, managers, members, employees and agents of Holdco, **QCE LLC,** the Company and their subsidiaries and of current and former members of the Board of Managers of QCE Holding **LLC**.

Ex. 26, at MEYERS_00001243.

This change was significant, because it substituted the second-tier entity (QCE) for the ultimate parent entity (Holdco—*i.e.*, Finance). Paul Weiss did *not* substitute the defined term "Company," which would have broadened the plaintiffs' coverage by keeping Holdco on the hook and adding all of Holdco's subsidiaries. Paul Weiss made contemporaneous changes to the Indemnification Provision and the Release Provision that did broaden the provisions in favor of the plaintiffs. For example, Paul Weiss added the words "and agreements" after the reference to "indemnification provisions." Paul Weiss also added "QCE LLC" to the list of entities whose existing indemnification obligations would continue. Although QCE as an entity was already picked up by the defined term

24

"Company," this change made QCE's inclusion explicit. Paul Weiss also revised the Release Provision to cut back on the carve-out from the release. Akin Gump wanted the carve-out to extend to "gross negligence, willful misconduct, or fraud." Paul Weiss revised the carve-out to extend only to "unlawful acts."

At the time, Paul Weiss had control of the Restructuring Term Sheet, and it was Paul Weiss who made these changes. Meyers previously had proposed that Holdco assume the indemnity obligations, and he was the primary client representative. Paul Weiss would not have made a change contrary to the client representative's wishes without client input. Substituting QCE LLC for Holdco was a change that the parties consciously made.

The Indemnification Provision as it appeared in Paul Weiss' last version of the Restructuring Term Sheet became the final version. On December 23, 2011, the parties signed the Restructuring Support Agreement, which incorporated the Restructuring Term Sheet as an exhibit. The Indemnification Provision in the final version identified QCE as the entity that was assuming the indemnification obligations:

> Assumption/continuation by QCE LLC of all indemnification provisions and agreements currently in place for current and former directors, officers, managers, members, employees and agents of QCE Holding LLC, QCE LLC, the Company and their subsidiaries and of current and former members of the Board of Managers of QCE Holding LLC.

Ex. 27, at MEYERS_00032041.

### 2. The Subscription Agreement And Plan of Reorganization

During the same period that the parties were finalizing the Restructuring Term Sheet, they also were drafting a Subscription Agreement and the Plan of Reorganization. Both are consistent with the agreement reached in the final version of the Restructuring

25

Term Sheet to the effect that only QCE assumed any indemnification obligations owed by Holdings and Incentive.

The Subscription Agreement was the document that governed the portion of the Restructuring in which the holders of second-lien debt would exchange their debt for equity in Finance. In the Subscription Agreement, Finance made representations to the holders of second-lien debt about the obligations that Finance and its subsidiaries would continue to have after closing. In a representation regarding employee benefit arrangements, Finance listed the Indemnification Agreements on the relevant schedule as obligations that one of its subsidiaries would continue to owe. *See* Ex. 28, at MEYERS00008867–69. The schedule identified each Indemnification Agreement as an obligation "[t]o be assumed by QCE LLC at the Closing." *Id.* Notably, and consistent with the Restructuring Term Sheet, the schedule to the Subscription Agreement referred to "QCE LLC" as the entity that was assuming the obligations, not QCE and its subsidiaries.

In a later email regarding the Subscription Agreement, Paul Weiss reiterated that QCE was assuming these obligations. Ex. 29. In Section 5(g) of the Subscription Agreement, Finance represented that any related-party agreements between Finance and any of its subsidiaries, on the one hand, and Old Holding, Incentive, or any of their affiliates, on the other hand, would be terminated without cost to Finance or any of its subsidiaries. This provision arguably applied to the Indemnification Agreements. In an email dated December 22, 2011, Paul Weiss confirmed that this provision did not apply to the "Indemnity Agreements that will be assumed by QCE LLC." *Id.*

26

The Subscription Agreement thus tracked the Restructuring Term Sheet in contemplating that only QCE was assuming the indemnification obligations previously owed by other entities. So did the Plan of Reorganization, which the parties were drafting contemporaneously to use as a fallback if the Restructuring did not obtain the necessary lender approvals. Paul Weiss and its Delaware co-counsel, Young Conaway Stargatt & Taylor, LLP, were prepared to file the Plan of Reorganization in the United States Bankruptcy Court for the District of Delaware, and the names of both firms appear on the first page of the plan as its proponents.

On December 15, 2011, the same day that Paul Weiss revised the Restructuring Term Sheet to specify that QCE would be the party assuming the existing indemnification obligations, Paul Weiss revised the applicable section of the Plan of Reorganization, titled "Survival of Indemnification and Reimbursement Obligations," to provide as follows:

> Any and all respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, of the Debtors and Reorganized Debtors to indemnify and reimburse persons who are current or former directors, officers, members, managers, employees or agents of any of the Debtors (collectively, the "Indemnity Obligations") shall survive confirmation of ~~the~~this Plan and are Reinstated, or shall be treated as if they are executory contracts that are assumed pursuant to section 365 of the Bankruptcy Code under ~~the~~this Plan as of the Effective Date, and such obligations shall survive confirmation of the Plan, shall remain unaffected by the Plan, and shall not be discharged or impaired by the Plan, irrespective of whether the indemnification or reimbursement obligation is owed in connection with any event occurring before, on or after the Petition Date, it being understood that all indemnification provisions in place on and prior to the Effective Date for directors, officers, members, managers or employees and agents of the Debtors shall survive the effectiveness of ~~the~~this Plan for claims related to or in connection with any actions, omissions or transactions prior to the

27

Effective Date (including prior to the Petition Date). In addition, effective upon the Effective Date, Reorganized Opco shall assume all Indemnity Obligations of QCE Holding LLC (the "Holding's Indemnity Obligations"), and all such assumed Holding's Indemnity Oblgations shall survive confirmation of this Plan as obligations of Reorganized Opco, and shall not be discharged or otherwise impaired by this Plan.

Ex. 31, at MEYERS_00001438. The Plan of Reorganization defined "Reorganized Opco" as "on and after the Effective Date, QCE LLC." *Id.* at MEYERS_00001427.

As a result of this change, the Plan of Reorganization tracked the Restructuring Term Sheet by having QCE and only QCE assume the indemnification obligations previously owed by Old Holding. But the Plan of Reorganization as revised failed to pick up indemnification obligations previously owed by Incentive. On December 20, 2011, Paul Weiss circulated a revised version of the Plan of Reorganization that fix this omission. The revised version of the provision stated that "Reorganized Opco" would assume all indemnity obligations of "QCE Holding LLC and QCE Incentive LLC." Ex. 32, at MEYERS_00002701. In the final version, "Reorganized Opco" (*viz.*, QCE) remained the assuming entity. Ex. 33, at MEYERS_00014577, MEYERS_00014587.

### 3. The Assignment Agreement

As noted, the parties began drafting the Assignment Agreement late in the process. The substantive negotiations over the Indemnification Provision and the Release Provision took place in the context of the Restructuring Term Sheet. The initial draft of the Assignment Agreement, which Paul Weiss prepared, was dated December 18, 2011. That was three days after Paul Weiss circulated the version of the Restructuring Term Sheet that

28

reflected the parties' agreement to substitute QCE for Holdco as the party that would assume Old Holding and Incentive's indemnification obligations.

Consistent with that Restructuring Term Sheet, the draft that Paul Weiss circulated provided for QCE to assume the indemnification obligations. Section 1 of the draft agreement, titled "Assignment and Assumption," provided as follows:

> (a)  QCE Holding hereby assigns, transfers and conveys to QCE all of QCE Holding's right, title and interest in and to the Assumed Agreements.
>
> (b)  QCE hereby accepts, assumes, takes over and succeeds to, all of the right, title and interest in and to QCE Holding under the Assumed Agreements, and QCE hereby covenants and agrees to discharge, perform and comply with, and to be bound by, all the terms, conditions, provisions, obligations, covenants and duties of QCE Holding under (and any liabilities arising out of) the Assumed Agreements from and after the date hereof as if QCE were an original party thereto. For the avoidance of doubt, from and after the date hereof (i) any reference to QCE Holding LLC in each Assumed Agreement shall be construed as a reference to QCE LLC, (ii) QCE Holding shall have no responsibilities under the Assumed Agreements except as set forth in Section 3 below [addressing mutual releases], and (iii) the Indemnitees shall have the right to enforce any and all claims (for liabilities, performance or otherwise) under the Assumed Agreements against QCE and shall look solely to QCE for any such claims under the Assumed Agreements.

Ex. 34, at MEYERS_00027705.

The introductory paragraph of the initial draft identified QCE using different language than what appears in the final draft. It named as a party to the agreement

> QCE LLC, a Delaware limited liability company ('QCE') (on behalf of itself and each of its direct and indirect subsidiaries [as set forth on Schedule I attached hereto]), [each of the entities listed on the signature page hereto as a Company Party (each, a "Company Party," and collectively, the "Company Parties") . . . .

*Id.* at MEYERS_00027704. In a footnote, counsel observed, "Note to Draft: Alternative to using Schedule I (having each QCE sub execute this agreement)." *Id.* at

MEYERS_00027727. Through this note and the bracketed language, Paul Weiss proposed alternative means of identifying the "Company Parties," who were the direct and indirect subsidiaries of QCE. One alternative was to list them on Schedule I. Another was to have each entity submit a signature page.

Meyers commented on the Paul Weiss draft. He did not revise any of the provisions relating to QCE's assumption of the indemnification obligations. He did ask "which agreements are being assumed," because the draft appeared only to refer to the Indemnification Agreements and not to other indemnification obligations. Ex. 35, at MEYERS_00029119. He clearly focused on the definitions that were being used, because he suggested simplifying the Release Provision by using the defined term "Company Part[ies]." *Id.* at MEYERS_00029120.

On December 20, 2011, after speaking with the other parties, Paul Weiss circulated a revised draft of the Assignment Agreement. Ex. 36. Meyers again commented on the draft. He focused on the definitions, indicating that there was no need to continue bracketing the concept of "Company Parties" and that the term should be used to refer to the subsidiaries of QCE. He responded to the alternatives for binding the subsidiaries, commenting "I don't think we need each sub to sign." *Id.* at MEYERS_00027923. He also responded to a question by Paul Weiss about the definition of "QCE Holdings" by noting that it was different than the term "Holdco" that was used in the Restructuring Term Sheet. *Id.* at MEYERS_00027900. Despite contemplating that term and the use of "Company Parties," Meyers did not replace any of the references to QCE with more expansive term,

nor or did he add language such as "and the Company Parties" after QCE to indicate that QCE's subsidiaries were also assuming the indemnification obligations.

On December 22, 2011, Paul Weiss circulated a further draft of the Assignment Agreement that had been "revised based on our discussion and comments received from Akin Gump." Ex. 37, at MEYERS_00029902. The December 22 draft revised one of the recitals as follows:

> WHEREAS, the [Restructuring Support Agreement] contemplates the assumption **by QCE** of all indemnification provisions and agreements currently in place for current and former directors, officers, managers, members, employees and agents of QCE Holding, QCE Finance [~~LLC~~], QCE [~~LLC~~] **and** its subsidiaries and of current and former members of the Board of Managers of QCE Holding.

*Id.* at MEYERS_00029943. This edit tracked the Restructuring Term Sheet, which identified QCE as the entity assuming the indemnification obligations.

The December 22 draft also added a new provision that called out the assumption of all indemnification obligations owed by Old Holding and Incentive, including those in the Old Holding Agreement and the Incentive Agreement. The new Section 1(c) stated as follows:

> QCE hereby accepts, assumes, takes over and succeeds to, all Indemnity Obligations of QCE Holding LLC and QCE Incentive. As respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements, board resolutions, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, of QCE Holding and all of its direct and indirect subsidiaries to indemnify and reimburse persons who are current or former directors, officers, members, managers, managing members, employees or agents of QCE Holding and QCE Incentive (collectively, the "Indemnity Obligations"). As used in this Agreement, "Indemnity Obligations" shall mean any and all respective obligations, whether pursuant

31

to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements, board resolutions, applicable state or non-bankruptcy law, or specific agreement or any combination of the foregoing, of the Releasing/Released Parties (as defined below) to indemnify and reimburse persons who are current or former directors, officers, members, managers, managing members, employees or agents of any of the Debtors.

*Id.* at MEYERS_00029944. The second and third sentences of this additional paragraph are redundant, but the inclusion of the third sentence, which uses the term "Debtors," indicates what happened. The parties agreed to use the indemnification language from the Plan of Reorganization, where they already had agreed on its scope. Paul Weiss copied that sentence and pasted it as a new Section 1(c), wordsmithed the first two sentences to make it work for the Assignment Agreement, but failed to delete the third sentence that had been copied over. For present purposes, the revision demonstrates that the parties intended for the scope of the Indemnification Provision in the Assignment Agreement to parallel both the Restructuring Term Sheet and the Plan of Reorganization.

The December 22 draft also made significant changes to the Release Provision by adding a host entities and actors that were identified in the Plan of Reorganization. *See id.* at MEYERS_00029945. The specifics of those changes are too lengthy and tangential to include, but they confirm that the parties were (i) tracking the Restructuring Term Sheet and the Plan of Reorganization, and (ii) focused on the specific entities that were undertaking particular obligations.

In response to the December 22 draft, Akin Gump revised the Indemnification Provision to strike the second sentence rather than the third. *See* Ex. 38, at MEYERS_00014138.002. Akin Gump also struck the reference to Incentive and

eliminated some of the sources of indemnification rights. *Id.* Paul Weiss and Meyers discussed the edits and conferred with Weil Gotshal & Manges LLP, counsel to the first-lien lenders. A Weil attorney advised that "he wouldn't take Akin's deletions in the assumed Indemnification Obligations section because what [Paul Weiss] drafted accurately tracks the language in the Plan [of Reorganization], and if we accept their change it will no longer pick up everything picked up in the Plan (like state law)." *Id.* at MEYERS_00014135. Paul Weiss contacted Akin Gump, and they "agreed that the assumption language in Section 1(c) will track the language as finally agreed to in the Plan [of Reorganization]." Ex. 39, at MEYERS_00014539. Ironically, this resulted in the final provision using the term "Debtors," which appears in the language of the Plan of Reorganization but is not defined in the Assignment Agreement. It nevertheless demonstrates yet again that the Assignment Agreement sought to track the substantive agreements reached in the Restructuring Term Sheet and implemented initially in the Plan of Reorganization.

On December 22, 2011, Paul Weiss circulated the final version of the Assignment Agreement. Ex. 40. Section 1(c) appeared in blacklined form as follows:

> QCE hereby accepts, assumes, takes over and succeeds to, all Indemnity Obligations of QCE Holding LLC **and QCE Incentive**. As used in this Agreement, "Indemnity Obligations" shall mean any and all respective obligations, whether pursuant to certificates of incorporation, codes of regulation, by-laws, limited liability company agreements, operating agreements, limited liability partnership agreements or any combination of the foregoing, of QCE Holding **and QCE Incentive** to indemnify and reimburse persons who are current or former directors, officers, members, managers managing members, employees or agents of any of the Debtors.

*Id.* at MEYERS_0003986. This is the provision as it appears in the executed version of the Assignment Agreement.

## D.     The Implications Of The Drafting History

The drafting history establishes that the Assignment Agreement sought to implement the scope of the Indemnity Provision that the parties negotiated as part of the Restructuring Term Sheet, incorporated by reference into the Restructuring Support Agreement, and fleshed out in detailed language in the Plan of Reorganization. The drafting history shows that QCE and only QCE assumed the obligations previously owed by Old Holding and Incentive. The Subscription Agreement, which was drafted contemporaneously, provides additional support for this interpretation.

The Restructuring Term Sheet unambiguously called for QCE, and not its subsidiaries, to assume the indemnification obligations. It distinguished between (i) QCE, which referred only to QCE as an entity, (ii) Holdco, which referred only to Finance as an entity, and (iii) the Company, which referred to Finance and all of its direct and indirect subsidiaries, including QCE and the Subs. The Restructuring Term Sheet stated that QCE was assuming the indemnification obligations previously owed by Old Holding and Incentive. Ex. 27, at MEYERS_00032041.

Having reached agreement on this deal point, the parties initially sought to implement it in greater detail through the Plan of Reorganization. That document provides that "effective upon the Effective Date, Reorganized Opco shall assume all Indemnity Obligations of QCE Holding LLC and QCE Incentive LLC . . . ." Ex. 33, at

34

MEYERS_00014587. It defines "Reorganized Opco" as "on and after the Effective Date, QCE LLC, as reorganized under and pursuant to this Plan." *Id.*, at MEYERS_00014577.

Contemporaneously, the parties drafted the Subscription Agreement, which made representations to the second-lien lenders about the post-Restructuring obligations that Finance and its subsidiaries would owe. The Subscription Agreement identifies sixteen Indemnification Agreements and states that each was "[t]o be assumed by QCE LLC at the Closing." Ex. 28, at MEYERS_00008867–69.

During the negotiation of the Restructuring Term Sheet, Meyers initially suggested that "Holdco" assume the obligations. Ex. 24, at MEYERS_00039183. After discussions between the parties, Paul Weiss circulated a draft that substituted "QCE LLC" for "Holdco." Ex. 26, at MEYERS_00001243. As discussed previously, this was a conscious change. It remained in the Restructuring Term Sheet from that point on, despite a series of other changes to the document.

Consistent with the Restructuring Term Sheet, every draft of the Assignment Agreement provided for the assumption of indemnity obligations by QCE. Meyers commented heavily on drafts of the Assignment Agreement, but he never sought to identify additional entities that would take on the indemnification obligations. His comments at times focused on the identity of particular entities or groups of entities, so he was not overlooking the issue. It was also Meyers who confirmed that the Assignment Agreement should eliminate the brackets around the definition of the term "Company Parties," which referred to QCE subsidiaries, yet he never sought to use the term "Company Parties" to expand the entities that were undertaking obligations under the Indemnification Provision.

The drafting history also shows that the language used in the Assignment Agreement to identify QCE sought to ensure that QCE could bind its subsidiaries to their obligations under the Assignment Agreement, rather than to impose QCE's obligations on its subsidiaries. In the draft dated December 20, 2011, Paul Weiss proposed two alternatives for binding the subsidiaries to their obligations. One was to have QCE sign on behalf of entities listed on a schedule. The other was to have each entity provide a signature page. Meyers commented that he did not see the need for separate signature pages.

Binding the subsidiaries to the Assignment Agreement was essential because the Restructuring Term Sheet included both the Indemnification Provision *and* the Release Provision. The latter required Finance, QCE, and all of their subsidiaries to grant full releases of liability. To implement this requirement, the Assignment Agreement contained two separate release provisions, once for Finance and its subsidiaries and the other for QCE and its subsidiaries. For the subsidiaries to grant the releases, they needed to be bound to the Assignment Agreement. Accordingly, after defining QCE Finance, LLC as "QCE Finance," the Assignment Agreement added the language "on behalf of itself and each of its direct and indirect subsidiaries." Ex. 3 at QCE-P00045152. Likewise, after defining QCE , LLC as "QCE," the Assignment Agreement added the same language: "on behalf of itself and each of its direct and indirect subsidiaries." *Id.* Finance and QCE each granted a release "on behalf of itself and all of its direct and indirect subsidiaries." Notably, however, the Release Provision for QCE also contained a carve-out stating that "the . . . releases shall not apply to QCE and the Indemnitees solely with respect to the Assumed Agreements . . . ." *Id.* at QCE-P00045155. The provision thus specified that although QCE was granting a

36

release on behalf of itself and its subsidiaries, it was assuming obligations only on behalf of itself.

Based on the drafting history and context, it is clear that the parties agreed that QCE would assume the indemnification obligations previously owed by Old Holding and Incentive. The Subs did not assume those obligations, and QCE did not act on behalf of the Subs to cause them to assume those obligations. Only QCE assumed these obligations.

In response, the plaintiffs make the thematic argument that because they were giving up control over QCE and its subsidiaries, they necessarily would have insisted on having QCE and all of its subsidiaries, including the Subs, take on the indemnification obligations. At the pleadings stage, based on the transactional context, it was reasonable to draw that inference in favor of the plaintiffs. At the current stage, after discovery, and in light of the record, that inference is no longer reasonable. The parties expressly agreed that only QCE would assume the indemnification obligations.

The plaintiffs also have cited snippets of extrinsic evidence that they say points towards a different interpretation. One example is that when the plaintiffs demanded indemnification and advancement from QCE and its subsidiaries, the Quiznos general counsel failed to dispute how they framed the parties that owed the obligation. Viewed in isolation, it might be reasonable to draw a plaintiff-friendly inference based on that correspondence. In light of the record as a whole, however, such an inference is not reasonable.

Finally, the plaintiffs introduced in support of their position an affidavit from Meyers, who averred that he believed when he signed the Assignment Agreement that QCE

was assuming indemnification obligations on behalf of the Subs. This decision gives minimal weight to Meyers' conclusory assertion, which is far outweighed by the other evidence in the record. His affidavit was provided after discovery closed. It contradicts his deposition testimony and the record evidence. And his counsel could have elicited the averments in his affidavit during his deposition, as counsel did with the two other plaintiffs who were deposed. "Had they done so, opposing counsel could have tested the assertions through cross-examination. Because the lawyers eschewed that course, this decision largely discounts" the affidavit. *Pell v. Kill*, 135 A.3d 764, 779 (Del. Ch. 2016) (citations omitted); *see Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("To the extent the affidavits contradict the depositions, this Court will exclude the offending affidavit testimony."). In any event, "it is generally not the parties' unexpressed intent or understanding that is relevant." *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *5 n.4 (Del. Ch. Nov. 28, 1995) (Allen, C.). "[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 20007) (footnotes omitted).

## III.    CONCLUSION

The Subs did not assume any indemnification or advancement obligations under the Assignment Agreement. Summary judgment is granted as to this issue pursuant to Court of Chancery Rule 56(h). On the basis of this ruling, summary judgment is granted in favor of the Subs as to all of the remaining, non-stayed claims in the case, except for (i) the

Officer Plaintiffs' claims under the Subs' operating agreements and (ii) Consumer Capital's claim to subrogation, which only survives to the extent of potential subrogation to the Officer Plaintiffs' claims under the Subs' operating agreements. Both of the remaining claims will be addressed separately.